```
 1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF FLORIDA
 2              CASE NO: 17-20003-CIV-JLK
   _____

 4  NARCISA PEREZ CHAVEZ,
    and all others similarly
 5  situated under 29 USC 216 (B),

 6
                      Plaintiff,
 7
                      -vs-
 8
    BERNARDA M ARANCEDO,
 9

10                    Defendants.
   _____
11

12                    LAW OFFICES OF J.H. ZIDELL, P.A.
13  AT:               300 71 Street
                      Suite 605
14                    Miami Beach, Florida 33141
                      August 25, 2017
15                    10:45 a.m.

16  _____

17         DEPOSITION OF  BERNARDA M ARANCEDO
   _____
18

19         Taken before Rochel Albert, CSR and Notary

20  Public in and for the State of Florida at Large,

21  pursuant to Notice of Taking Deposition filed in

22  the above cause.

23  _____

24      DEPO EXPRESS REPORTING, INC. (305) 305 3333

25
```

1   APPEARANCES:

2       DAVID KELLY, Esq.
        LAW OFFICES OF J.H. ZIDELL
3       300 71st Street, Suite 605
        Miami Beach, Florida  33141
4       Attorney for Plaintiff

5

6       ALAN LEMURA, ESQ.
        JAMES D. WHISENAND, ESQ
7       WHISENAND & TURNER, P.A.
        501 Brickell Key, Suite 602
8       Miami, Florida  33131
        Attorney for Defendant

9

10

11   Also present:  CARLOS DIAZ, INTERPRETER

12                    I N D E X

13   WITNESS                EXAMINATION  BY        PAGE

14   BERNARDA M ARANCEDO        MS. JAFF  ........ 3

15

     EXHIBITS FOR IDENTIFICATION              PAGE
16   A – Calenders                             91

17

18

19

20

21

22

23

24

25

```
1                     CARLOS DIAZ,
2               interpreter, was sworn in to
3               translate from English to Spanish
4               and Spanish to English to the best of
5               his ability.
6                  BERNARDA M ARANCEDO,
7               being first duly sworn by the court
8               reporter, testified as follows:
9          MS. JAFF:  We are going to start off just
10    by stating our appearances for the record.  So
11    Rivkah Jaff here on behalf of Plaintiff.  If you
12    two could state your appearances for the record?
13          MR. LEMURA:  Alan Lemura on behalf of the
14    defendant.
15          MR. WHISENAND:  Jim Whisenand for the
16    defendant.
17          THE WITNESS:  Maria Bernarda Arancedo.
18          MS. JAFF:  Just appearances.  So the
19    attorneys.
20                     EXAMINATION
21    BY MS. JAFF:
22       Q   Good morning, ma'am.  My name is Rivkah,
23    and I am here on behalf of the Plaintiff.
24          I do not know what your hold on the
25    English language is.  However, we have coordinated
```

```
 1    a translator for you.  I am going to ask that you

 2    wait for the full question to be translated to you

 3    before you respond, and that you only respond in

 4    Spanish.

 5        A    Okay.

 6        Q    Also, the court reporter cannot take down

 7    two people talking at the same time.  So I am

 8    going to ask you to wait until I complete my

 9    question before you respond, so that we don't talk

10    over each other.

11            MR. WHISENAND:  It would be the

12    interpreter.  She has to get it from Spanish.

13            MS. JAFF:  I know how it works.

14            MR. WHISENAND:  You said to wait until

15    you --

16            MS. JAFF:  To wait until I finish my

17    questions before she responds.

18            MR. WHISENAND:  But it's really she has to

19    wait until the interpreter completes the

20    translation before she answers.

21            THE INTERPRETER:  Right.  That was the

22    previous question.

23            MR. WHISENAND:  Can you please translate

24    everything, not half of the stuff.  So you need to

25    translate what I just said.
```

```
 1          The witness should wait until the
 2     interpreter -- please translate.  The witness
 3     should wait until the interpreter translates the
 4     entire question before answering.
 5          And please translate everything.
 6          THE INTERPRETER:  You don't want me to
 7     translate?
 8          MR. WHISENAND:  I want you to translate
 9     every single thing.  Thank you.
10     BY MS. JAFF:
11     Q    If you want to take a break at any point,
12     ma'am, I am happy to take a break, so long as I
13     don't have a question pending.  If I have a
14     question pending, I am going to ask that you first
15     respond to my question before we take the break.
16     A    Perfect.
17     Q    Also, the court reporter cannot take down
18     nonverbal responses, like "uh-huh," "huh-uh," or
19     head shakes or head nods.  So I am going to ask
20     that all your responses please be verbal.
21     A    Of course.
22     Q    Also, I am not trying to confuse you.  So
23     if I ask you a question and you are unclear of
24     what I am asking you, please ask me to rephrase it
25     or ask it in a different way, so that you are able
```

1    to understand my questions.

2         A    Okay.

3         Q    You understand that today your deposition

4    is under oath and subject to the penalties of

5    perjury?

6         A    Yes.

7         Q    Is there any reason why you are unable to

8    testify truthfully and honestly today?

9              MR. WHISENAND:  Objection to form.

10             THE WITNESS:  No.

11        Q    Is there any reason why your memory will

12   be affected today?

13        A    No.

14        Q    From time to time, your attorney is going

15   to object.  If you want to give him a few minutes

16   before you respond, so he has an opportunity to

17   make his objection for the record, that will be a

18   good idea.

19        A    I didn't understand.  Excuse me.  That

20   part, I didn't understand.

21        Q    Your attorney is permitted under the rules

22   to make objections to my questions.  So from time

23   to time, you might hear me ask a question and you

24   might hear your attorney say objection or object

25   to form.

 1      A     Okay, perfect.

 2      Q     If you want to just pause for a minute

 3   before you respond.  That way your attorneys will

 4   have an opportunity to make their objections for

 5   the record before you respond.

 6      A     Perfect.

 7      Q     Unless you are instructed by your

 8   attorneys not to answer, you do need to respond to

 9   my question, regardless of the fact that they

10   objected.

11      A     Perfect.

12      Q     Just a reminder, regardless of the fact if

13   you understand my question in English, please wait

14   for the translation and only respond in Spanish.

15      A     Yes.

16           MS. JAFF:  Are there any stipulations

17   either of you want to make on the record before I

18   beginning my questioning, to streamline the

19   questions?

20           MR. WHISENAND:  I have no idea what you

21   mean.

22           MS. JAFF:  For example, are you willing to

23   stipulate to coverage?

24           MR. WHISENAND:  No.

25           MS. JAFF:  Okay.  Is there anything else

```
 1    you are willing to stipulate to?
 2            MR. WHISENAND:  I have no idea what you
 3    are talking about.  So no.
 4            MS. JAFF:  Okay.
 5  BY MS. JAFF:
 6       Q    Can you please state and spell your name
 7    for the record?
 8       A    Maria Bernarda Arancedo.
 9            THE INTERPRETER:  I'm saying, she wants
10    you to spell it.
11       A    M-A-R-I-A, B-E-R-N-A-R-D-A,
12    A-R-A-N-C-E-D-O, Arancedo.
13       Q    Do you have any other last names that you
14    are known by?
15       A    No.
16       Q    Do you have any nicknames that you are
17    known by?
18       A    No.
19       Q    Do you have any aliases that you are known
20    by?
21       A    No.
22       Q    What is your date of birth, ma'am?
23       A    April 3rd, '71.
24       Q    And we will go off the record for this,
25    for your Social Security number.
```

```
 1              MR. WHISENAND:  Objection as to form.
 2              THE WITNESS:  I don't know the whole thing
 3     by heart.  It ends in 2000.
 4              MR. WHISENAND:  I objected to the form.
 5     You really need to translate it.
 6              THE INTERPRETER:  You want me to translate
 7     "objection to form?"
 8              MR. WHISENAND:  I want you to translate
 9     everything said in the deposition, please.
10              THE INTERPRETER:  You want me to translate
11     anything that she says to the attorneys?  That may
12     be --
13              MR. WHISENAND:  Sir, anything that is said
14     in the deposition, please.
15              THE INTERPRETER:  Okay.  I may have to
16     stop and ask questions.
17              MR. WHISENAND:  Whatever you need to do.
18     Thank you.
19              THE WITNESS:  Perfect.
20     BY MS. JAFF:
21        Q    Ma'am, what would you have to look at in
22     order to refresh your recollection on the first
23     numbers of your Social Security?
24              THE INTERPRETER:  I should say objection
25     to form was what was said by your attorney.
```

```
 1            THE WITNESS:  To look it up in my phone.
 2            MS. JAFF:  Do you have any objection to
 3    her giving me her full Social Security number?
 4            MR. WHISENAND:  We will provide it later.
 5            THE INTERPRETER:  Forgive me for
 6    interrupting.  But if I am going to translate what
 7    happens between the attorneys to her, I am going
 8    to have to ask each attorney to pause after
 9    anything they said to the other attorney.  Do you
10    understand?  That is what he wants me to do.
11            MS. JAFF:  So you will agree to amend
12    interrogatory number one responses and provide me
13    with her Social Security number?
14            MR. WHISENAND:  I have to look at the
15    interrogatory and see what it says.
16            THE INTERPRETER:  Excuse me, forgive me
17    for doing this.  He wants me to translate
18    everything that is said, including the
19    conversation between the attorneys.  That will
20    subject each attorney to have to pause while I say
21    anything you say to him in Spanish to her, and
22    then he will say English to you and you will have
23    to pause.  This is what he wants me to do.
24            MS. JAFF:  Okay.  Fine.  I asked whether
25    or not he will be amending the interrogatory
```

1    responses that specifically asked for the

2    deponent's Social Security number, because he

3    won't let her look it up on her phone sitting here

4    today.  He responded saying he doesn't know what

5    the interrogatory asks.

6              So I just want confirmation on the record,

7    that after the deposition the full Social Security

8    number is going to be provided to us.

9              THE WITNESS:  Perfect.

10             MS. JAFF:  I am going to ask your attorney

11   to confirm that.

12             MR. WHISENAND:  We will provide it.

13   BY MS. JAFF:

14        Q    Okay, ma'am.  Can you give me your current

15   primary address?

16        A    10 Cape Florida Drive.

17        Q    Is that an apartment or a house?

18        A    House.

19        Q    Is it located in Miami?

20        A    Key Biscayne.

21        Q    What is the zip code?

22        A    33149.

23        Q    Do you live there with anyone who is over

24   the age of 18?

25        A    When?

1    Q    Now.

2    A    Today?

3    Q    Yes.

4    A    Almost no one lives in my house.  Today I

5    have a son who is 21 years old and a 16-year-old,

6    today.  Because almost no one lives in my house.

7    Q    What is the name of your son that is 21,

8    ma'am?

9    A    Santiago Avendano.

10   Q    Can you spell the last name for us,

11   please?

12   A    A-V-E-N-D-A-N-O.

13   Q    Other than your son, do you live with

14   anyone else who is over the age of 18?

15   A    No.

16   Q    Do you have any other residence other than

17   the primary address that you just gave us?

18        MR. WHISENAND:  Objection as to form.

19        THE WITNESS:  What is that?

20   Q    Do you own any other residence other than

21   the residence that you just gave us, 10 Cape

22   Florida Drive?

23        MR. WHISENAND:  Objection as to form.

24        MR. LEMURA:  I object to the translation.

25   She said residence, not property.  You translated

```
 1    property.
 2              THE INTERPRETER:  Thank you.
 3              Did you say do you own any other
 4    residence?  Is that what you said?  You said own?
 5              MS. JAFF:  Do you own any other residence
 6    other than the residence you just gave us?
 7              THE WITNESS:  So what does that mean?
 8        Q    Do you not understand my question, ma'am?
 9        A    Objection to the form.  What does that
10    mean?
11        Q    That means you can still answer unless you
12    are instructed not to.
13        A    If I show up in any, I really don't know.
14    My property is in Florida.
15        Q    You don't know --
16        A    Key Biscayne.
17        Q    You don't know if you own any other
18    residence other than the address that you just
19    gave us?
20              MR. WHISENAND:  Objection as to form.
21              THE WITNESS:  No, no.
22        Q    Who would know that, ma'am?
23        A    My accountant.
24        Q    And who is your accountant?
25        A    I had one whose name was Patricio, I
```

 1     think, Gonzalez, I think.  I think.  Now I think

 2     there's a new one, six months ago.

 3          Q     What is that new one's name?

 4          A     I don't know that.  I would have to look

 5     on the cell phone.  Maybe I have it there.  I

 6     don't know.

 7          Q     Sitting here today, you can't remember who

 8     your accountant was for the last six months?

 9          A     No.  Neither for the past ten years

10     either.  I am a housewife, no.

11          Q     Are you currently married, ma'am?

12          A     Yes.

13          Q     What is the name of your husband?

14          A     Gonzalo Avendano.

15          Q     Can you spell that for us, please?

16          A     G-O-N-Z-A-L-O, A-V-E-N-D-A-N-O.

17          Q     And how long have you been married to

18     Gonzalo?

19          A     Twenty-one or 22.

20          Q     Years?

21          A     Yes.

22          Q     Does Gonzalo live in the United States?

23          A     No.

24          Q     Where does Gonzalo live?

25          A     Argentina.

1    Q    How often does Gonzalo come and visit you?

2         MR. WHISENAND:  In what time period?

3         THE WITNESS:  He comes for Christmas two

4    weeks, three weeks.  And every two or three

5    months, a week, five days, four days.  A little

6    bit.

7    Q    Has Gonzalo visited you for Christmas for

8    two or three weeks and every two or three months

9    for approximately five days since 2012?

10   A    Yes.

11   Q    And he did the same in the year in 2013?

12   A    Yes.

13   Q    And he did the same in the year 2014?

14   A    We lived for two years in Argentina.  Let

15   me see.

16        MR. WHISENAND:  No.

17        THE WITNESS:  Let me think.  We are in

18   2017.  Okay.  2014, 2015, I lived in Argentina

19   with my husband and children.  There.  In 2014,

20   2015 and half of 2016, Gonzalo did not come

21   frequently from Argentina, because I was living

22   there.

23   Q    For the year 2014, you lived in Argentina

24   for the entire year?

25   A    I would come for one week every two or

```
1    three months to see my friends and my house, and
2    it was my break, my free time because I like a
3    vacation, no.  But every three months, two months,
4    one week, because my husband was back in
5    Argentina.  And two children studying at the
6    Lincoln School in Argentina, two sons studying
7    there.  Older children.  Older children, sons,
8    yes.
9         Q    Ma'am, in the year 2012, you lived in the
10   United States and your husband lived in Argentina?
11        A    2012, I don't know if Gonzalo had U.S.
12   residence.  In 2012, my husband could have stayed
13   longer than the usual.  With June, July, August,
14   during vacation, we are never at the house.  April
15   vacation, neither.  And neither on Christmas.  We
16   are at my house in Key Biscayne always.  When
17   Gonzalo comes for Christmas, he doesn't go to Key
18   Biscayne.  We go elsewhere to vacation, for
19   vacation, and Christmas.
20        Q    Ma'am, in the year 2012, did you live in
21   the United States?
22             MR. WHISENAND:  Objection as to form.
23        Q    In the year 2012, did Gonzalo live in the
24   United States?
25             MR. WHISENAND:  Objection as to form.
```

1          THE WITNESS:  I don't know.  I don't know.

2     Q    You don't know if your husband was living

3     here in the year 2012?

4          MR. WHISENAND:  Objection to form.

5          THE WITNESS:  No.

6     Q    How do you not know if your husband was

7     living in the United States in the year 2012?

8          MR. WHISENAND:  That is a rhetorical

9     question.  That is a rhetorical question.  Please

10    ask fact questions.

11         MS. JAFF:  I am going to ask my question,

12    and you can object to form and she can either

13    respond or not respond.

14         MR. WHISENAND:  I am respectfully asking

15    that you not ask rhetorical questions and that you

16    ask proper fact questions.

17         MS. JAFF:  That is noted.

18         MR. WHISENAND:  This is a form of

19    harassment.

20         MS. JAFF:  Can you reask my question,

21    please, and he can maintain the same objection

22    each time.

23         (The record was read by the court

24    reporter.)

25         MR. WHISENAND:  Objection as to form.

```
 1              If you have an answer, fine.  If you
 2   don't, fine.
 3              THE WITNESS:  Okay.  The question she is
 4   asking me is if in 2012 my husband was living with
 5   me?
 6      Q    No.  I asked you if in 2012, whether your
 7   husband was living in the United States?
 8              MR. WHISENAND:  Objection to form.
 9              THE WITNESS:  No, I don't know what you or
10   she is asking me.  I don't understand.
11      Q    I am asking you if you have personal
12   knowledge about whether or not your husband lived
13   in the United States in the year 2012?
14              MR. WHISENAND:  Objection as to form.
15              THE WITNESS:  What does objection to form
16   mean.
17      Q    It means that you can answer.
18      A    In 2012, Gonzalo, I don't know the
19   residence.  I don't know it.  In April, he
20   wasn't -- because he was in Argentina in June,
21   July, August, neither -- because he was in
22   Argentina, neither was he there in Bogota.  Then
23   if he was living in 2012 in the U.S., less than
24   120 days a year, shared those days with trips to
25   New York, and some days trips to Bahamas, and some
```

1    days trips to Wellington.  He is not a husband

2    that lives in my house as a traditional family.

3        Q    In the year 2013, did your husband live in

4    the United States with you?

5            MR. WHISENAND:  Objection as to form.

6    With all respect, sir, the translations are

7    haphazard.

8            THE INTERPRETER:  What was haphazard about

9    this, sir?  About this very last one, what was

10   haphazard?

11           MS. JAFF:  Let me reask the question.

12           THE INTERPRETER:  What was haphazard about

13   this last question, sir?

14           MR. WHISENAND:  The translations are more

15   or less.  They are not correct translations, and

16   there are words left out.

17           THE INTERPRETER:  What word was left out

18   about this last question?

19           MR. WHISENAND:  We would have to read it

20   back.  Just make the note.

21           MS. JAFF:  I am going to reask my

22   question.

23           THE INTERPRETER:  I am being super careful

24   about every -- sometimes if I ask you again, it's

25   because I really want to be exactly sure.

```
 1              MR. WHISENAND:  I say that with respect,
 2       sir.
 3              THE INTERPRETER:  I understand, yes.
 4              MS. JAFF:  I do not speak Spanish.  So I
 5       am relying on you to translate.  So I will try and
 6       speak a little bit slower, so every single word I
 7       say can be translated and every single word that
 8       she says can be translated.  So can you please ask
 9       her to talk slower when she responds to you, and I
10       will do the same.
11              THE INTERPRETER:  I am trying to
12       recapitulate everything that was said by the two
13       attorneys.
14              MS. JAFF:  Do you need Rochel to read it
15       back to you?
16              THE INTERPRETER:  Maybe, Rochel, the last
17       part.
18               (The record was read by the court
19       reporter.)
20              THE INTERPRETER:  I was very respectful,
21       too, sir.  I just wanted to know what word was
22       left out.
23   BY MS. JAFF:
24        Q    Ma'am, in the year 2013, did your husband
25       live in the United States?
```

1          MR. WHISENAND:  Objection as to form.

2          THE WITNESS:  If he had domicile in the

3     United States, that, I don't know.

4      Q     What does that mean?

5      A     That he doesn't live in the United States.

6     He lives in Argentina.  In 2013, I already

7     counted, June, July, August, vacations.  December,

8     January, February, in another place, not Key

9     Biscayne.  March and a little bit of April, in Key

10    Biscayne and then he goes.  Under 100, under 120,

11    100 days a year, always.  He does not live here.

12     Q     So in the year 2012, your husband came

13    back and forth from Argentina so that he was here

14    for a maximum of 100 to 120 days?

15          MR. WHISENAND:  Objection as to form.

16    Misstating the witness' testimony.

17          THE WITNESS:  Okay.

18     Q     Could you reask my question, then?

19    Because it doesn't seem like she understood it.

20    So can you read my question back to her?

21          (The record was read by the court

22    reporter.)

23          THE WITNESS:  Yes, in the United States.

24          MR. WHISENAND:  Objection as to form.

25          THE WITNESS:  When they say objection, is

1    that wrong with me?

2        Q    Ma'am, in the year 2013, is that true that

3    your husband also was here for a maximum of 120

4    days?

5             MR. WHISENAND:  Objection as to form.

6        Q    Did you not understand my question?

7        A    Can I ask a little question?  When over

8    here they are saying objection, what does this

9    mean?  Over here when he says objection, what does

10   that mean?

11       Q    Okay.  In the year 2013 --

12            MR. WHISENAND:  It means that I am

13   objecting to the form of her question or the

14   content of her question or a technical part of the

15   question.

16            THE WITNESS:  Okay.

17       Q    They are preserving the record when they

18   say object to form.  Unless you are instructed not

19   to answer, then you need to answer the question.

20       A    Okay.

21            THE INTERPRETER:  May I just say to her as

22   a technical thing?

23            MS. JAFF:  No.

24       Q    In the year 2013, was your husband also

25   only living here in the United States for a

```
 1    maximum of 120 days?
 2        A    Yes.
 3             MR. WHISENAND:  Objection as to form.
 4        Q    In the year 2014, I believe your testimony
 5    is that you lived in Argentina; is that correct?
 6    Is that correct?
 7        A    Yes.
 8        Q    And that in the year 2014, you would come
 9    back every two or three months for a week at a
10    time; is that correct?
11        A    Yes.
12             MR. WHISENAND:  Objection as to form.
13        Q    Is that true for the year 2015, as well?
14             MR. WHISENAND:  Objection as to form.
15             THE WITNESS:  Yes.
16        Q    And that is true for half of either 2016,
17    as well, correct?
18             MR. WHISENAND:  Objection as to form.
19             THE WITNESS:  Yes.
20        Q    And what happened for the last half of the
21    year 2016?
22             MR. WHISENAND:  Objection as to form.
23        A    I returned around August 20$^{th}$ of 2016 to
24    live in my house when my youngest child or son was
25    16.
```

1     Q     And that is the residence that you gave

2     us, 10 Cape Florida?

3     A     Key Biscayne, yes.

4     Q     And that is the 10 Cape address that you

5     gave us, correct?

6           MR. WHISENAND:  Objection as to form.

7           THE WITNESS:  Yes.

8     Q     In the year 2012, what was your status in

9     the United States?

10          MR. WHISENAND:  Objection as to form.

11    What do you mean by status?

12          MS. JAFF:  It's my understanding of the

13    rules in federal court, you are only allowed to

14    say objection or object to form.  If your client

15    needs clarification of my question, she can ask me

16    for clarification.  If there's anything on cross

17    that you want to ask to clarify the record, you

18    can do that, as well.

19          But it's my understanding of the rules is

20    that you're only allowed to make nonspeaking

21    objections.  And if you are aware of something

22    else, please advise us.  Are you aware of anything

23    that I am not aware of?

24          MR. WHISENAND:  Please proceed.

25          MS. JAFF:  Can you please repeat my

1    question for me.

2              (The question was read by the court

3    reporter.)

4              THE WITNESS:  In 2012, American, I am an

5    American.

6        Q    An American citizen?

7        A    American passport.  I don't know.

8        Q    Do you know what year you became a citizen

9    of the United States?

10       A    No.  I would have to look for papers.

11       Q    What kind of papers would you have to look

12   for?

13       A    Every paper they gave me with a photograph

14   and a big American flag.  I swore and I saluted

15   the American flag.  It was a big place with

16   people.

17       Q    Is your husband an American citizen?

18       A    No.  He lives in Argentina.

19       Q    And he is not an American resident?

20       A    No.

21       Q    And he is not an American citizen,

22   correct?

23       A    No.

24             MR. WHISENAND:  Objection as to form as to

25   the residency question.

1    Q    In the year 2012, did you own any other

2    properties other than the Ten Cape address that

3    you gave us?

4         MR. WHISENAND:  Objection as to form.

5         THE WITNESS:  Really, if you ask me about

6    me, better.  I don't know anything outside of me.

7    Q    Well, I am asking you about your personal

8    knowledge.

9    A    No, I don't have any knowledge of anything

10   else.  My house in Key Biscayne is mine, with a

11   mortgage like any other person that is owed, and

12   it's my home.  It's my house.

13   Q    In the year 2012, based on your personal

14   knowledge, did you own any other properties other

15   than the 10 Cape address that you gave us?

16   A    If I signed any paper of the accountant

17   and they gave me something, I don't know.  To me,

18   my house is Key Biscayne.  That is it.

19        MR. WHISENAND:  In the next five minutes,

20   can we take a restroom break?

21        MS. JAFF:  Sure.

22   Q    In the year 2012, to your knowledge, did

23   you own any other properties other than the 10

24   Cape address that you told us?

25   A    I don't know.

```
 1      Q    In the year 2013, did you own any other
 2   properties other than the 10 Cape address that you
 3   gave us?
 4      A    I don't know that.
 5      Q    In the year 2014, did you own any other
 6   properties other than the 10 Cape address that you
 7   gave us?
 8      A    Excuse me.  I don't understand why you are
 9   asking me if there's any other property.  My house
10   is Key Biscayne, and if my accountant or someone,
11   I have signed papers, I don't know of what
12   property you are talking to me about.  That is,
13   why are you asking me about other property?  My
14   house is Key Biscayne, in my name and no one else.
15      Q    Ma'am, you are here today for a deposition
16   to answer my questions.  I am not here today to
17   answer your questions.  This will go a lot quicker
18   if you listen carefully to my questions and answer
19   my questions.  If there is a question that I am
20   asking you that you don't understand, I am happy
21   to reask it or ask it in a different way.  Okay?
22      A    Okay.
23      Q    We are going to take a few minute's break.
24   I am going to remind you that you are under oath,
25   and so you cannot talk to your attorneys about
```

1    your testimony.

2           MR. WHISENAND:  That is an incorrect

3    statement.

4                 (A break was taken.)

5    BY MS. JAFF:

6      Q    I am just going to remind you to wait for

7    the translation, and only respond in Spanish.  I

8    am also going to remind you that if you do not

9    understand the question, to ask me to rephrase it

10   or ask it a different way.

11     A    Perfect.  Okay.

12     Q    In the year 2013, did you own any other

13   properties?

14          MR. WHISENAND:  Objection as to form.

15          THE WITNESS:  Not to my knowledge.

16     Q    In the year 2014, did you own any other

17   properties?

18          MR. WHISENAND:  Objection to form.

19          THE WITNESS:  Not to my knowledge.

20     Q    In the year 2015, did you own any other

21   property?

22          MR. WHISENAND:  Objection to form.

23          THE WITNESS:  Not to my knowledge.

24     Q    In the year 2016, did you own any other

25   property?

```
 1              MR. WHISENAND:  Objection as to form.
 2              THE WITNESS:  Not to my knowledge.
 3         Q    In the year 2012, who lived with you in
 4    your house?
 5              MR. WHISENAND:  Objection as to form.
 6              THE WITNESS:  Santiago, Benjamin and
 7    Joaquin.
 8         Q    Can you spell the last name that you gave
 9    us?
10         A    Joaquin, J-O-A-Q-U-I-N.
11         Q    And those three names that you just said,
12    those are your children's names?
13         A    Yes.
14         Q    And do all three of your children have the
15    same last name as you?
16         A    No.
17         Q    What is Santiago's last name?
18         A    The last name of the father, Avendano.
19         Q    And what is the last name of -- I think
20    you said *Benjamin?
21         A    Avendano.
22         Q    And the last name for Joaquin, I think?
23         A    Avendano.
24         Q    In the year 2012, how old was Santiago?
25         A    Seventeen.
```

```
 1        Q    In the year 2012, how old was Benjamin?

 2        A    Fifteen.

 3        Q    And in the year 2012, how old was Joaquin?

 4        A    Thirteen.

 5        Q    In the year 2012, is there anyone else

 6   that you have not mentioned that lived in the

 7   residence with you?

 8        A    The father lived there when he visited.

 9   And Nancy.

10        Q    And what is Nancy's last name?

11        A    No, I don't know that.  I only know she is

12   Nancy.

13        Q    And what is Nancy's relationship to you?

14        A    An arrangement that she had, that we both

15   had, and she lived there and she helped me with

16   some of the things at the house.

17        Q    Is Nancy, Narcisa Perez Chavez, the

18   Plaintiff in this case?

19        A    That I discovered in January.

20        Q    What do you mean by that is what you

21   discovered in January?

22        A    She sent me a letter that said Narcisa

23   Chavez.  I didn't know who this was.  Later on, I

24   realized this was Nancy.

25        Q    So the Plaintiff in this lawsuit, to your
```

```
1    knowledge, you refer to her as Nancy?
2          MR. WHISENAND:  Objection as to form.
3          THE WITNESS:  Yes, Nancy.
4    Q    Can you tell me in detail what your
5    arrangement was with Nancy?
6    A    What she wanted in order to help me, one,
7    two, three, four houses.  No, beds, in 2012.  In
8    the morning, she would make the bed.  She would
9    clean out three bathrooms.  There was no
10   breakfast, since no one takes breakfast.  There
11   was no lunch because my children were at school.
12   There was no tea because they don't drink tea.
13   And they would return more or less at 5:00 in the
14   afternoon.  And each one of them, their things,
15   their studies and their private tutors.
16          And Nancy would organize the house in the
17   morning.  On Mondays, the towels and sheets would
18   be changed on Monday.  Tuesdays, she would manage
19   a little bit, how ever she could, the wash.  The
20   clothes were washed.  The boys had a school
21   uniform.
22   Q    In the year 2012, did you interview Nancy?
23   A    I met her.
24   Q    Do you recall what date you met her?
25   A    Around January.  Between mid-January and
```

```
 1    the end of January.
 2        Q    And how did Nancy come to you?
 3             MR. WHISENAND:  Objection as to form.
 4             THE WITNESS:  Through a friend.
 5        Q    Do you recall the friend's name?
 6        A    Through a female friend.  Monica.
 7        Q    Do you know Monica's last name?
 8        A    Fomperosa.
 9        Q    Can you spell that for me, please?
10        A    F-O-M-P-E-R-O-S-A.
11        Q    Was Nancy working for Monica, and that is
12    how she was referred to you?
13        A    No.
14             MR. WHISENAND:  Objection as to form.
15        Q    How did Monica know Nancy?
16             MR. WHISENAND:  Objection as to form.
17             THE WITNESS:  From Key Biscayne.
18        Q    When you met with Nancy for the first
19    time, do you recall what you asked her?
20        A    No.
21        Q    Do you recall what you told her her job
22    duties would be?
23             MR. WHISENAND:  Objection as to form.
24             THE WITNESS:  No, not job.
25        Q    What did you discuss with Nancy in your
```

```
 1   first meeting?
 2       A    An arrangement with Nancy that she would
 3   have a room, a bathroom, air conditioning, two
 4   beds, two windows, a very large closet.  Since I
 5   am never home, neither are my children, that she
 6   would help make the beds and to keep up with the
 7   children's uniforms.  If she needed -- if I needed
 8   some help, I would ask her.
 9       Q    Did you tell Nancy what days of the week
10   she would be needing to work?
11           MR. WHISENAND:  Objection as to form.
12           THE WITNESS:  Telling her the days, no.
13   She would live at the house.  When I was living in
14   Argentina, she lived in the house the same way,
15   and she had nothing to do.  And she would leave
16   from my house to do other jobs.
17       Q    Please try to answer only the questions
18   that I am asking you, ma'am.
19           MR. WHISENAND:  She is giving the best
20   answer she has, and she has a right to give you
21   the best answer that she has.
22       Q    When you met with Nancy for the first
23   time, did you tell her what days of the week that
24   she would be required to work?
25           MR. WHISENAND:  Objection as to form.
```

```
 1            THE WITNESS:  From Monday to Friday.  She
 2    added -- and this is true.  She decided to enter
 3    or to put in Sundays, because I think she
 4    preferred to wake up in the house on Mondays and
 5    not to take the bus, at that time, which was full
 6    of people.  If she was ill, she would stay in her
 7    room, in her bed, if she was ill, or if she had
 8    nowhere to go on Saturday.  Yes, at night.
 9       Q    When you hired Nancy, what hours did you
10    say that she would have to work Monday through
11    Friday?
12            MR. WHISENAND:  Objection as to form.
13            THE WITNESS:  I did not hire.
14            THE INTERPRETER:  I want to ask this
15    question again.
16            THE WITNESS:  We had an arrangement, an
17    agreement.
18       Q    Did you have a written agreement with
19    Nancy?
20       A    No.
21            THE INTERPRETER:  Should I ask the
22    question again?
23            MS. JAFF:  Did you not ask my question?
24            THE INTERPRETER:  I asked but she went to
25    the word hired, and she said, excuse me, we did
```

1    not hire.

2              MS. JAFF:  I will reask my question.

3              MR. WHISENAND:  Wait a minute.  The role

4    of the interpreter is to simply interpret.  Not to

5    organize the deposition.

6              THE INTERPRETER:  Yes.

7              MR. WHISENAND:  Then you shouldn't be

8    asking --

9              THE INTERPRETER:  I am asking.  I am not

10   organizing.

11             MR. WHISENAND:  I don't believe that is

12   your role.  I believe your role is just to

13   translate Spanish to English, English to Spanish,

14   and that is it.

15             THE INTERPRETER:  Sometimes I have to ask

16   you, for example, what you said.

17             MR. WHISENAND:  That is fine.

18             THE INTERPRETER:  If you ask her -- like

19   before, you told me to translate everything you

20   said to the attorney.

21             MR. WHISENAND:  Yes, sir, I did.

22             MS. JAFF:  Let me ask my question.  Please

23   just translate what I am saying.

24             THE INTERPRETER:  I did.

25             MS. JAFF:  And just translate what she is

1    saying.

2              THE INTERPRETER:  I did.

3    BY MS. JAFF:

4        Q    Was there a written agreement between you

5    and Nancy?

6        A    No.

7        Q    Was the agreement between you and Nancy

8    only verbal?

9              MR. WHISENAND:  Objection as to form.

10             THE WITNESS:  Yes.

11       Q    Can you tell me what exactly that

12   agreement -- the verbal agreement was?

13             MR. WHISENAND:  Objection.

14             THE WITNESS:  How about you first

15   translate my question, he will say object to form,

16   then you translate object to form, and then she

17   can answer.  That way you don't forget my

18   question.  Okay?

19             MR. WHISENAND:  Then he will have to say

20   objection after I speak with her.

21             MS. JAFF:  He will wait until you

22   translate and she will wait until he says his

23   objection.

24             THE INTERPRETER:  I agree.  That's ideal.

25             MS. JAFF:  I am losing my train of thought

1    and I am having to reask questions, and this is

2    taking an inordinate amount of time for a

3    deposition that I am not used to.

4            THE INTERPRETER:  I totally agree.

5            MS. JAFF:  So let me ask my question.

6    Wait for the translation, if you don't mind, to

7    say object to form.  He will translate the

8    question.  You will translate his objection.  And

9    she will respond.  Okay?

10           THE INTERPRETER:  Totally.  Thank you.

11           MS. JAFF:  Can you repeat my question,

12   please.

13           (The record was read by the court

14   reporter.)

15           MR. WHISENAND:  Objection as to form.

16           MR. LEMURA:  Objection as to translation.

17   Agreement is acuerdo.  Arrangement is arreglo.

18           THE INTERPRETER:  That is the word she

19   used, is arreglo.

20           MS. JAFF:  It doesn't matter what she is

21   using.  It matters what I am using, because I am

22   the one asking the question.

23           THE INTERPRETER:  I translated this

24   correctly.

25           MS. JAFF:  Could you please ask the

1    question that I am asking, not the words that she

2    is putting into my mouth?

3              THE INTERPRETER:  I translated your words.

4              MS. JAFF:  Okay.  Can you repeat my

5    question, Rochel, please?

6              (The record was read by the court

7    reporter.)

8              THE INTERPRETER:  She insists on the word

9    arreglo.

10             MS. JAFF:  Okay.  You don't have to say

11   that.  All you have to say is whatever she just

12   said, say it in English.  If she said --

13             THE INTERPRETER:  Arrangement.

14             MS. JAFF:  -- arrangement, then say

15   arrangement.  Don't say she insisted on using it.

16   I don't need to know what she is saying.  I just

17   need to know what she said for the record.

18             THE INTERPRETER:  Arrangement.

19             MS. JAFF:  Okay.  Can you please repeat my

20   question?

21             (The record was read by the court

22   reporter.)

23             THE WITNESS:  That she helped me with the

24   house, to make the beds, to keep the bathrooms

25   clean, the three bathrooms.  To use, either myself

1    or her, the washing machines.  To keep the

2    uniforms ironed during the times that she was in

3    the house, if she could keep them ironed.

4    Everything was tranquil and relaxed.

5         Q    You had said earlier that you had agreed

6    that she would work Monday to Friday, correct?

7              MR. WHISENAND:  Objection as to form.

8              THE WITNESS:  On school days, this is when

9    I most would arrange with Nancy, when I most

10   needed her.  She helped me.

11        Q    What were the hours between Monday to

12   Friday?

13             MR. WHISENAND:  Objection to form.

14             THE WITNESS:  She could do whatever she

15   wanted while she was there, while the bed was made

16   or the bathroom organized.  But it could have been

17   fast, an hour and a half or two hours.  She was

18   fast, just as me.

19        Q    So you did not explain to Nancy what hours

20   she would have to work Monday to Friday?

21        A    No.

22             MR. WHISENAND:  Objection as to form.

23             There's no question.

24        A    Same thing with the wake-up schedule, same

25   as me.  6:35, 6:40.  It's the hour that we all get

1    up.

2            MR. WHISENAND:  Wait until there's a

3    question.

4            THE WITNESS:  Oh, okay.

5        Q    You told Nancy that she would have to wake

6    up around the same time as the rest of the house,

7    at about 6:30 to 6:45?

8        A    Yes, like myself, yes.

9        Q    And what would she have to do at about

10   6:30, 6:45?

11       A    Nothing.  At 7:00, I leave and my children

12   too.  So make the beds.

13       Q    And around what time would your children

14   return from school?

15           MR. WHISENAND:  Objection as to form.

16           THE WITNESS:  4:30 to 5:00.

17       Q    And throughout the day, were you in and

18   out of the house?

19           MR. WHISENAND:  Objection as to form.

20           THE WITNESS:  Yes.  I have my routines, my

21   sources, my studies, my gym.  Yes, I leave at 7:00

22   and I come back at 1:30, 2:00.  I sleep a little

23   siesta for a while, the same as Nancy.  There's no

24   one in the house.  And then I leave again to go

25   out to eat with my girlfriends, around 6:00.

1    Every day around 6:00, I meet with my girlfriends

2    in Key Biscayne, because I have no husband.  In

3    another country.  So that you know.

4        Q    And what time do you usually return home?

5        A    I eat outside.  So 9:00 or 10:00.

6        Q    Is Nancy responsible for making dinner?

7             MR. WHISENAND:  Objection as to form.

8             THE WITNESS:  Not every day.  Some days,

9    at 6:30.  The rice machine, what do you call it?

10   The one that cooks the rice by itself?  Early, at

11   7:00.  It's a grilled steak.  So the kitchen is

12   over, it's only a grilled steak.  And in my

13   children's debit cards, you can see that they eat

14   every single day outside.

15       Q    On average, from Monday to Friday, how

16   often would Nancy make dinner at about 6:30?

17            MR. WHISENAND:  Objection as to form.

18            THE WITNESS:  Three times a week.

19       Q    And would Nancy be responsible for

20   cleaning up after dinner?

21            MR. WHISENAND:  Objection as to form.

22            THE WITNESS:  To clear out the table, my

23   children always.  And she, to put on the

24   dishwasher.

25       Q    During the years 2012 to 2016, did your

1    children often have friends over?

2         MR. WHISENAND:  Objection as to form.

3         THE WITNESS:  Often, no.  On the weekends,

4    my children don't live at the house.  We leave on

5    Fridays.  Wait, let me tell you.  November,

6    December, January, February, March and April, we

7    leave with my children at 4:30 in the afternoon on

8    Friday, and spend weekends away from Key Biscayne.

9    Always.  Plus June, July, August, away from Key

10   Biscayne.  They didn't even go to birthday parties

11   on Fridays.  Of course, because I would leave the

12   city.

13   Q    Ma'am, on February, March, April, November

14   and December, during the years 2012 to 2016, you

15   left every Friday at 4:30 p.m.?

16        MR. WHISENAND:  Objection as to form.

17        THE WITNESS:  November, December, January,

18   February, March and April, yes, always.

19   Q    Where would you spend the weekend?

20   A    Horse riding.

21   Q    Did you have a house somewhere else?

22        MR. WHISENAND:  Objection as to form.

23        THE WITNESS:  Not me, not me.

24   Q    Did your husband have a house that you

25   stayed at?

1      A      No.

2             MR. WHISENAND:  Objection as to form.

3      Q      Whose house did you stay at for horse

4      riding?

5             MR. WHISENAND:  I don't think that is

6      really relevant.

7             THE WITNESS:  The family or the mother of

8      Gonzalo.  I don't know the property's owner.

9      Q      When would you return back to Key

10     Biscayne?

11     A      After eating on Sundays, I would arrive at

12     Key Biscayne at 8:30, 9:00 at night.

13     Q      And then in June, July and August for the

14     years 2012 to 2016, you said that you were also

15     away from Key Biscayne; is that correct?

16     A      Yes, June, July and August.

17            MR. WHISENAND:  Objection to form.

18     Q      And these vacations, were they within the

19     state of Florida?

20            MR. WHISENAND:  I really think these

21     questions are not relevant.  I am very soon going

22     to instruct the witness not to answer.  So please

23     try to make them relevant.

24            MS. JAFF:  Okay.

25            MR. WHISENAND:  Thank you.

```
 1              MS. JAFF:  Can you reask my question,
 2      please?
 3              (The record was read by the court
 4      reporter.)
 5         A    June, July and August?
 6         Q    Yes.
 7         A    No.
 8              MR. WHISENAND:  Objection as to form.
 9         Q    Did Nancy go with you on these vacations
10      in the months of June, July and August?
11         A    No.
12         Q    When you went for the weekend horse
13      riding, did Nancy come with you?
14         A    No.
15         Q    And what were Nancy's job duties while you
16      were at the horse riding?
17              MR. WHISENAND:  Objection as to form.
18              MR. LEMURA:  Objection as to translation.
19      She said job duties.  You said just deberes.
20              THE INTERPRETER:  Okay.
21              MS. JAFF:  Could you repeat my question,
22      please?
23              (The record was read by the court
24      reporter.)
25              MR. WHISENAND:  Objection as to form.
```

```
 1              THE WITNESS:  None.  Because I would leave
 2      on Fridays, Saturdays, and I would come back on
 3      Sunday night.  There was no one at the house.
 4      Nancy, if she wanted to, she could go with her
 5      boyfriend or she could stay in my house if she
 6      wanted to to sleep and that is it.  She could go
 7      shopping.  I don't know.  She had a key.  She
 8      would come in and out as she pleased.
 9         Q    When you hired Nancy in 2012, you said
10      that you had explained to her that she would be
11      given a room, and you had described the room for
12      us; is that correct?
13              MR. WHISENAND:  Objection to form.
14              THE WITNESS:  Excuse me.  Could you repeat
15      that again?
16              MS. JAFF:  Sure.  Could you repeat my
17      question, Rochel.
18              (The record was read by the court
19      reporter.)
20              THE WITNESS:  You said the word contract
21      or hire, and she was not hired.  It was a friendly
22      arrangement with Nancy.  Nancy had her own private
23      room, her flat screen TV, her air conditioning,
24      two beds in case she invited someone.  Two windows
25      that looked out to the garden.  A complete
```

1    bathroom, new, impeccable.  New, complete.  A

2    closet, a safety box for her, and all her

3    products, used with my credit card.

4        Q    Did you tell Nancy how much she was going

5    to get paid?

6             MR. WHISENAND:  Objection as to form.

7             THE WITNESS:  It was an agreement by word,

8    and she wanted 4.50.

9             MR. WHISENAND:  Objection to the

10   translation.  The witness uses the word

11   arrangement.  Not agreement.  An arrangement is

12   what the witness had testified.

13            THE INTERPRETER:  I have to stop here.  I

14   have been told the same word with two different

15   English translations by both of these gentlemen.

16   She said acuerdo, which the other gentleman said

17   before, called me on it.  I said, as I had been

18   corrected, an agreement.  Now he says that she has

19   been continuously saying arreglo, which they both

20   overlap, but it means an arrangement.  I said

21   agreement, which is what I was told to say.

22            MS. JAFF:  She used the word acuerdo right

23   now?

24            THE INTERPRETER:  I used it.

25            MS. JAFF:  Did she respond with that word?

1           THE INTERPRETER:  She always keeps saying

2   arrangement, arreglo, every time she hears hire.

3   Frankly, contract or hiring is arreglo, how she

4   corrects me.

5       Q    You agreed to paid Nancy $450.  Is that

6   per week or per month?

7           MR. WHISENAND:  Objection as to form.

8           THE WITNESS:  Yes.  It's what Nancy

9   wanted.

10      Q    So that was per week or per month?

11      A    A week.

12          MR. WHISENAND:  Objection to form.

13      Q    And did you pay Nancy in cash or by check?

14      A    Cash.

15      Q    And did Nancy's rate of pay go up at all

16  during the time that she worked for you?

17          MR. WHISENAND:  Objection to form.

18          THE WITNESS:  No.  She wanted 450 with her

19  room and her comfortableness.  And the products

20  that she would buy with my credit card.

21      Q    Did you always pay Nancy cash?

22      A    Yes.

23      Q    At the end of 2012, did you give Nancy a

24  W-2 or 1099 tax form?

25          MR. WHISENAND:  Objection as to form.

```
 1               THE WITNESS:  No.
 2      Q    Did you give Nancy at the end of 2012 any
 3   kind of document that reflected the total amount
 4   that you had paid her for that year?
 5      A    No.
 6      Q    Did your accountant issue any kind of
 7   document for Nancy at the end of 2012 with regards
 8   to how much money she had received in wages for
 9   that year?
10               MR. WHISENAND:  Objection as to form.
11               THE WITNESS:  No.
12      Q    In the year 2013, did you issue a W-2 or
13   1099 to Nancy, or any other tax document?
14               MR. WHISENAND:  Objection as to form.
15               THE WITNESS:  No.
16      Q    In the year 2013, did you give Nancy any
17   kind of document that reflected the total amount
18   of wages that you had paid her for that year?
19               MR. WHISENAND:  Objection as to form.
20               THE WITNESS:  No.
21      Q    Did your accountant issue any kind of form
22   or document for Nancy, reflecting the total amount
23   of wages that she had received in the year 2013?
24               MR. WHISENAND:  Objection as to form.
25               THE WITNESS:  Excuse me.  I didn't
```

1  understand.

2      Q    Did your accountant issue any kind of

3  document or form that reflected the total amount

4  of money in wages that Nancy had been paid for the

5  year 2013?

6          MR. WHISENAND:  Objection as to form.

7          THE WITNESS:  My accountant has nothing to

8  do with it because she is not an employee.  It's

9  an arrangement with her of you want to have a roof

10 over your head, a house, stay, help me.  Help me

11 in the morning or when I am not there.

12     Q    So is your answer no, that your accountant

13 did not --

14     A    No.

15     Q    Your accountant did not give Nancy any

16 kind of form that reflected the total wages that

17 she had received in the year 2013?

18     A    No.

19          MR. WHISENAND:  Objection as to form.

20     Q    In the year 2014, did you give Nancy any

21 kind of W-2, 1099 or other tax form that reflected

22 the total amount of wages that she had received

23 for that year?

24     A    No, no.

25          MR. WHISENAND:  Objection as to form.

```
 1       Q    In the year 2015, the same question.
 2            MR. WHISENAND:  Objection as to form.
 3            THE WITNESS:  No.
 4       Q    In the year 2016, the same question?
 5            MR. WHISENAND:  Objection as to form.
 6            THE WITNESS:  No, no.  This has nothing to
 7    do with an accountant.
 8       Q    In the year 2016 and 2015, you did not
 9    give a W-2, 1099 or other tax form for Nancy to
10    know her total wages for that year?
11            MR. WHISENAND:  Objection as to form.
12            THE WITNESS:  No.  Neither do I do that
13    with my son, and I give him 500 a week.
14       Q    In the year 2014 --
15       A    It's the same thing with Nancy.
16       Q    -- you did not give Nancy any kind of
17    documentation that showed the total wages that she
18    had received for that year, correct?
19       A    No.
20            MR. WHISENAND:  Objection as to form.
21       Q    For the year 2015, the same question?
22       A    No.
23            MR. WHISENAND:  Objection as to form.
24       Q    For the year 2016, the same question?
25       A    No.
```

```
 1              MR. WHISENAND:  Objection as to form.
 2      Q    In the year 2014, you did not have your
 3   accountant issue any kind of document or form or
 4   record for Nancy to know how much her total wages
 5   were for that year?
 6              MR. WHISENAND:  Objection as to form.
 7              THE WITNESS:  No.
 8      Q    And that is true for the year 2015 and
 9   2016, as well?
10              MR. WHISENAND:  Objection as to form.
11              THE WITNESS:  No.  The same as the
12   accountant did not give it to my son.  The
13   accountant has nothing to do with this.
14      Q    Is your answer no?
15              MR. WHISENAND:  Objection.
16              THE WITNESS:  No.
17      Q    Do you have any receipts or invoices of
18   the payments that you made to Nancy?
19      A    Yes.
20      Q    And what kind of forms are those?
21      A    I have several.
22      Q    Can you tell us what those documents are?
23      A    In the bank is a statement.  Every week,
24   the money that was taken out from Nancy.  The same
25   amount always.
```

1      Q    And what days of the week did you make

2   those -- would you do that transaction at the

3   bank?

4           MR. WHISENAND:  Objection as to form.

5           THE WITNESS:  I will take it out between

6   Thursday and Friday.

7      Q    Would you make those transactions in

8   person or just on your card at a machine?

9           MR. WHISENAND:  Objection as to form.

10          THE WITNESS:  In person.

11     Q    When you withdrew that money, was there a

12   transaction slip that said in the memo line what

13   that money was for?

14     A    Sometimes I would put it in.  Not all the

15   time.

16     Q    What would you put on the slip if you were

17   to put what it was for?

18     A    Nancy.

19     Q    During the year 2012 to 2016, was there

20   anyone else that you withdrew cash in order to

21   make payments to on a weekly basis?

22          MR. WHISENAND:  Objection as to form.

23          THE WITNESS:  No, not from that account.

24     Q    What did you mean by not from that

25   account?

1     A     No.   That I would take that out for Nancy

2   in person, Thursdays to Fridays from the Bank of

3   America.

4     Q     Was there another individual that you

5   would pay cash payments on a weekly basis to

6   during the years 2012 to 2016?

7          MR. WHISENAND:  Objection as to form.

8          THE WITNESS:  Yes.  To my children,

9   weekly, I always give them money.

10    Q     Anyone else?

11    A     Sometimes.  If I contracted someone, if I

12   hired someone by the hour.

13          MR. WHISENAND:  Objection to the

14   translation.

15          THE WITNESS:  If I hired or contracted

16   someone by the hour, I would take out money.

17    Q     What would you hire or contract someone to

18   do that you paid them by the hour during the year

19   2012 to 2016?

20    A     I had one person.  Her name was Esther.

21   She would come by the hour.  Sometimes, as now, I

22   contract people, handymen, to move rugs, to move

23   furniture, that type of stuff.

24    Q     Do you know what Esther's last name is?

25    A     No.   I was with her just now to see if she

```
 1    wants to come back to work with me.

 2        Q    And you don't know Esther's last name?

 3        A    No, no.

 4        Q    Do you know where Esther lives?

 5        A    I see her on Key Biscayne because she

 6    works at my girlfriend's house.

 7        Q    Who is your friend that Esther works with

 8    or for?

 9             MR. WHISENAND:  Objection as to form.

10             THE WITNESS:  Erancha.  Some days she

11    works Erancha, a Spaniard friend of mine, every

12    Friday.  Tuesdays, with Marceilles, another of my

13    girlfriends.  Wednesdays with Monica.  I do see

14    her a lot in Key Biscayne.

15        Q    Does Esther live at the house of any of

16    your friends?

17        A    Not now.

18        Q    And when Esther would come during the

19    years 2012 to 2016, what kind of job duties did

20    she have?

21        A    Esther never came in the years 2012 to

22    2016.

23             MR. WHISENAND:  Objection as to form.

24        Q    I asked you before, who was the person

25    that you hired or contracted and paid by the hours
```

1   during the year 2012 to 2016, and you had said

2   Esther.  Did I misunderstand you?

3            MR. WHISENAND:  Objection as to form.

4            THE WITNESS:  I made a mistake.  Okay.

5   2012 to 2013 is when Esther came.  After that, I

6   went to Argentina.

7       Q    Esther didn't work for you during the

8   second half of the year 2016?

9            MR. WHISENAND:  Objection as to form.

10      A    2016?  No.  Esther worked 2012, 2013.

11  When I went to Argentina, Esther no longer because

12  there was no one in the house.

13      Q    When you returned in the second half of

14  the year 2016, Esther didn't come and work for you

15  again?

16      A    Because it was just me and Joaquin,

17  Joaquin is already -- he is big.  He drives.  He

18  eats outside with his friends, and so do I.  Just

19  like me.

20      Q    What days of the week did Esther work for

21  you in the year 2012?

22      A    2012 and 2013, every Tuesday and every

23  Thursday, she would come in at 8:00 and she would

24  leave at 3:30 with a one-hour lunch.

25      Q    8:00 a.m. to 3:30 p.m.?

```
1          A     With an hour for lunch.

2          Q     And when she would come in every Tuesday

3     and Thursday, what were Esther's job duties?

4          A     It's directed by me.  For example, if

5     there was work needed in the outside, there was

6     glasswork to be done.  Or inside the house,

7     whatever was needed.

8          Q     During the year 2012 and 2013, Nancy and

9     Esther worked alongside each other?

10         A     Esther, yes.  Used to work, paid by the

11    hour.  However, with Nancy it was not work.  Nancy

12    on Wednesdays, she would leave my house.

13    Sometimes to the dentist.  Sometimes she wouldn't

14    say where.  And she would leave, okay.  You do the

15    beds in the morning and you leave, I don't have a

16    problem.  Where?  It was not like Esther with a

17    fixed schedule and fixed rules.  And that is why

18    do not compare Esther and Nancy.  It's not the

19    same thing.

20         Q     During the year 2012, whenever Esther

21    would come to work on a Tuesday, Nancy was not

22    there?

23              MR. WHISENAND:  Objection as to form.

24              THE WITNESS:  Most Tuesdays, yes.  And at

25    11:00, Esther sometimes would paint Nancy's nails,
```

1    manicure, pedicure.

2         Q    In the year 2013, every Tuesday that

3    Esther came to work for you, Nancy was not there?

4         A    Yes.  It could be that she might leave to

5    go to CVS at 11:00.  I don't look at this.  Esther

6    is more fixed.  Nancy, if she wants to go to CVS

7    or if she wants to go anywhere.  She could leave,

8    Esther, and leave, or she could leave.  It's not

9    the same thing, Esther and Nancy.  That is by the

10   hour.  It's work, it's different.

11        Q    Would Esther have knowledge of Nancy's job

12   duties?

13             MR. WHISENAND:  Objection as to form.

14             THE WITNESS:  More or less, yes.  Some,

15   but not much.

16        Q    And Esther would be at your house the same

17   time that Nancy was at your house near 2012 and

18   2013, correct?

19        A    Yes.

20             MR. WHISENAND:  Objection as to form.

21        Q    How much did you pay Esther?

22        A    I don't recall, but I could ask Esther.

23        Q    Esther you would also pay in cash,

24   correct?

25        A    Yes.

```
 1            MR. WHISENAND:  Do you know how much
 2    longer you will be?
 3            MS. JAFF:  I am hoping just an hour.
 4            MR. WHISENAND:  Can we go for an hour
 5    rather than break for lunch?
 6            MS. JAFF:  Yes, I would like that if you
 7    are okay with it.
 8            MR. WHISENAND:  Do you have any water?
 9            (A break was taken.)
10    BY MS. JAFF:
11       Q    For the year 2012, did you give Esther any
12    kind of tax documents for her to know how much
13    wages she had received for the year 2012?
14       A    To Esther?  No.
15            MR. WHISENAND:  Objection as to form.
16       Q    Is your answer the same for the year 2013
17    as to Esther?
18            MR. WHISENAND:  Objection as to form.
19            THE WITNESS:  No.
20       Q    Your answer is different?
21       A    Why?
22       Q    Because you just said no?
23            MR. WHISENAND:  I think there's confusion.
24            MS. JAFF:  I am going to reask my
25    question.
```

```
 1        Q    In the year 2013, did you give Esther any
 2   kind of document to show how much she had received
 3   in wages for that year from you?
 4        A    No.
 5             MR. WHISENAND:  Objection as to form.
 6        Q    And Esther was paid cash from the same
 7   bank account or a different bank account?
 8        A    Mixed.  I would mix with Esther.
 9        Q    When you hired Nancy, did you offer her --
10   did you offer to pay her more in wages in lieu of
11   giving her room and board?
12             MR. WHISENAND:  Objection as to form.
13        A    No.  Esther, she was with me -- just like
14   she was with me two times a week, she was with
15   Monica twice a week, as well.  Another two times
16   she goes to another friend of mine.
17        Q    Let me reask the question.
18        A    And she would sleep.
19        Q    Because I am not asking you about Esther.
20   I am asking you about Nancy.
21        A    Ah.
22        Q    I am going to reask my question.  When you
23   hired Nancy --
24        A    You mixed up the name.  You said Esther.
25        Q    I am going to reask the question so that
```

```
1    there's no confusion.
2            For Nancy, when you hired her, did you
3    offer her cash wages in lieu of room and board?
4            MR. WHISENAND:  Objection as to form.
5    Q    When you hired Nancy, did you offer to pay
6    her more in wages as an alternative for her living
7    in your house?
8    A    She's using that word that again is hired
9    that I don't know.  I don't know what is hired.
10   Q    Ma'am, could you wait for the translation,
11   please?
12           THE INTERPRETER:  Could you repeat my
13   question, please?
14   A    Arrangement or an agreement.  Agreement is
15   what I have.  I don't know what it is in English.
16   Q    He is just translating my questions.  If
17   he can --
18           MS. JAFF:  Can you read my question again
19   so he can ask it.
20           (The record was read by the court
21   reporter.)
22           MR. WHISENAND:  Objection as to form.
23           THE WITNESS:  Excuse me.  Could you put it
24   a different way?  Because I don't understand it.
25   Q    Sure.  Did you say to Nancy that instead
```

```
 1   of living in my house, I am going to pay you more

 2   in wages and you can go live wherever you wish?

 3            MR. WHISENAND:  Objection as to form.

 4            THE WITNESS:  The agreement with Nancy,

 5   she had nowhere to live.  That is why sometimes

 6   she would stay on Saturdays.  I never look at

 7   whether she would leave on Fridays or Saturdays.

 8   I would take off.  I would leave on Fridays.

 9   Nancy, that I don't know.

10      Q    That was not my question.  But I am going

11   to reask my question.  When you made your

12   arrangement, as you call it, with Nancy, did you

13   say to Nancy, I will pay you more in wages that

14   you do not have to live in my house?

15      A    Why would I say that?  No.  Why would I

16   say that?

17            MR. WHISENAND:  Objection as to form.

18      A    If she doesn't have a roof over her head,

19   why?  I don't understand.

20      Q    So is your answer no?  You did not offer

21   Nancy more money so that she did not have to live

22   in the house, as wages?

23            MR. WHISENAND:  Objection as to form.

24            THE WITNESS:  No.  Why?  I don't

25   understand.
```

```
 1        Q     Did you ever have the Department of Labor
 2   appraise the value of the room that Nancy was
 3   living in?
 4             MR. WHISENAND:  Objection as to form.
 5        Q     Do you have anyone else, either a person
 6   or entity or a company, appraise the value of the
 7   room that Nancy was living in?
 8        A     It can be done but I didn't do it, but it
 9   can be done.
10             MR. WHISENAND:  Objection as to form.
11        Q     But you didn't do it, correct?
12             MR. WHISENAND:  Objection as to form.
13        Q     Did you ever offer to pay Nancy the value
14   of the room as wages, and not have her live in
15   your house?
16             MR. WHISENAND:  Objection to form.
17        A     It's Nancy's house.  The arrangement, if
18   she wanted to leave, there would be no problem.
19   She never told me that she wanted to rent.  I
20   would pay the rent.  That would be no problem.
21   But she never said it.
22        Q     Did you ever offer that to her?
23        A     No.  Because if she is living alone in the
24   house, why would she spend and waste money, spend
25   her money?  Of course, if she is June, July,
```

1      August, December, January alone, those two years

2      myself living in Argentina.

3          Q    Did you explain to Nancy that the value of

4      the room was part of her salary?

5              MR. WHISENAND:  Objection as to form.

6              THE WITNESS:  It is not part of Nancy's

7      salary.

8              MR. WHISENAND:  Objection as to form.

9              THE WITNESS:  How am I going to charge for

10     the room?

11         Q    Did you ever tell Nancy that the rate of

12     pay that you were paying her was being credited

13     with the value of the room and board?

14         A    No.  I don't even know what that is, no.

15         Q    Did you keep any records of how much food

16     Nancy consumed?

17             MR. WHISENAND:  Objection as to form.

18             THE WITNESS:  No, Nancy would buy whatever

19     she wished on my credit card, whatever she wanted

20     to eat.  Because I don't eat in the house, and

21     neither does my son.  She is alone.  And she would

22     also buy some products for cleaning that she

23     liked.  If she wanted her food, papayas, anything

24     that she wanted on her own, yes, her food she

25     liked.

1        Q    Did Nancy --

2        A    Toothbrushes, combs, soaps, everything,

3    whatever she wanted to.  I wouldn't look at it.

4        Q    Did Nancy do the shopping for you and your

5    family?

6             MR. WHISENAND:  Objection as to form.

7             THE WITNESS:  Nancy, when she wanted to,

8    would go to CVS or to Winn-Dixie, and if she,

9    let's say, needed something to wash, she would buy

10   it.

11       Q    Would Nancy do grocery shopping for you

12   and your family?

13       A    The thing is not a lot of food because I

14   don't eat in my the house.  My son --

15       Q    Ma'am, I am trying to get through these

16   questions quickly.  So if you could please listen

17   to them and only answer what is being asked.

18             MR. WHISENAND:  She is listening and she

19   is giving you her complete answer.

20       Q    My question was, did Nancy do grocery

21   shopping for you and your family?

22       A    Sometimes.  Sometimes myself.  I also

23   would buy.

24       Q    During the week, on average, how often

25   would Nancy do the shopping, grocery shopping, for

1   you and your family?

2           MR. WHISENAND:  Objection as to form.

3           THE WITNESS:  To go on a pleasure walk

4   onto CVS, two or three times a week, she would go

5   to buy.  Every two or three weeks, Nancy would go.

6   I would also go.  I would also go to the

7   supermarket.  In my house, they don't eat.  So

8   there's no food.  It's more of cleaning.

9       Q   So Nancy would go grocery shopping for you

10  and your family every two or three weeks?

11      A   Every two or three weeks, yes, and for

12  Nancy, as well, because it's not just for my

13  family.  My family is just myself and my son, and

14  we eat outside.  I already said it.  It's more

15  really cleaning.

16      Q   Did Nancy use --

17          MR. WHISENAND:  Objection as to form.

18      Q   Did Nancy use a different method of

19  payment to pay for her items that she purchased

20  from grocery shopping as opposed to the items that

21  were purchased for you and your family?

22          MR. WHISENAND:  Objection to form.

23      A   No.  It was on my credit card, whatever

24  she wished.

25      Q   So there are no records that reflect how

1   much food Nancy consumed during the years 2012

2   through to and including 2016?

3           MR. WHISENAND:  Objection as to form.

4           THE WITNESS:  No.  I would have to make

5   out a balance of the Winn-Dixie card that Nancy

6   would use, and take out the percentage of what a

7   person would eat.

8       Q    So you would only be able to do an

9   estimation?

10          MR. WHISENAND:  Objection as to form.

11          THE WITNESS:  Yes.

12      Q    In this case, it's my understanding that

13  you are asking for the amount of rent to be

14  credited towards any overtime that may be owed or

15  minimum wages that -- strike that.

16          It's my understanding that in this case

17  you are claiming that some of the rent that should

18  be credited for the room and board should be

19  credited towards wages, as well.  How much are you

20  claiming that is owed for the value of the room?

21          MR. WHISENAND:  Objection as to form.

22          THE WITNESS:  I am not asking for

23  anything.

24      Q    How much money are you asking should be

25  credited for the food that Nancy consumed while

1    she worked for you?

2        A    I did not say that.

3        Q    Okay.  Was Nancy required to keep track of

4    the hours that she worked?

5            MR. WHISENAND:  Objection as to form.

6            THE WITNESS:  No.

7        Q    Was Esther required to keep track of the

8    hours that she worked?

9        A    Yes.

10       Q    And how was she required to do that?

11       A    Esther?

12       Q    Yes, ma'am.

13       A    Nothing.  She would come in at 8:00 and

14   leave at 3:30.

15       Q    So Esther was not required to use the

16   timekeeping system; for example, a punch card?

17       A    No, no.

18       Q    And Nancy was not required to use any kind

19   of timekeeping system; for example, a punch card?

20           MR. WHISENAND:  Objection as to form.

21           THE WITNESS:  Hours, Nancy, okay, this I

22   don't understand.  There are no hours with Nancy.

23   Nancy is free.  She does whatever she wishes and

24   she sleeps in the house.  She is not a worker like

25   Esther is, and has nothing to do with it.  Nancy

```
 1    sometimes -- Monica has come in to my house

 2    sometimes, and Nancy was not there.

 3         Q    So there are no records that reflect the

 4    amount of hours that Nancy worked?

 5         A    There are no records of hours, but there's

 6    myself, my children.  We know what she did, a

 7    little.  And if she wasn't in my house, if she was

 8    not in my house she would be at CVS or at the

 9    doctors, on Wednesdays.  Or some Wednesdays, she

10    would work for someone else, I think.  I have for

11    a gentleman that I know.

12         Q    What is the name of that gentleman?

13         A    This is Sarah's husband.

14         Q    And what is his name?

15         A    I don't recall now.

16         Q    What is Sarah's last name?

17         A    Negroni.

18         Q    Please spell that for the record.

19         A    N-E-G-R-O-N-I.  She is a friend of mine.

20         Q    Do you know her address?

21         A    She now lives in Spain, and her husband in

22    Brickell.

23         Q    Do you know the husband's address?

24         A    No.

25         Q    Do you know if they have the same last
```

1  name?

2      A     No.

3      Q     Do you know what the nature of the work

4  was that you allege that Nancy did for Sarah's

5  husband on Wednesdays?

6          MR. WHISENAND:  Objection to form.

7          THE WITNESS:  No.  I would have to call

8  and ask.

9      Q     Do you know Sarah's phone number?

10     A     Yes, in Spain.

11     Q     So you would be able to obtain her

12 husband's name, correct?

13         MR. WHISENAND:  Objection as to form.

14         THE WITNESS:  Yes.

15     Q     Who else do you think has knowledge about

16 the hours that Nancy worked for you?

17     A     Herself.

18     Q     Who else?  You had mentioned you, your

19 children, Sarah's husband.  Anyone else?

20     A     About when Nancy would leave to go to work

21 for my friend?

22     Q     No.  Who do you believe would have

23 knowledge about the hours that Nancy worked for

24 you?

25     A     My children.  The gardener in my house,

1    another gentleman, as well.  My friends.  She can

2    also say Monica.

3        Q    What is the name of your gardener that

4    would have information?

5        A    Trinidad.

6        Q    Is that T-R-I-N-I-D-A-D?

7        A    Yes.  Works with me for 16 years.

8        Q    Does Trinidad come to your house on a

9    particular day of the week in the years 2012 to

10   2016?

11           MR. WHISENAND:  Objection to the form.

12           THE WITNESS:  Yes, on Thursdays.

13       Q    Was there a particular person that would

14   come to the house during the years from 2012 to

15   2016, from Trinidad on Thursdays?

16       A    This is not understandable.  What are you

17   trying to say?

18       Q    You said that your gardener in your house

19   would have knowledge of Nancy's hours.  I am

20   trying to determine if there is a particular

21   person.

22       A    Okay.  I will explain.  On Thursdays,

23   Trino would come over, and if I were not in my

24   house and I was in Argentina, supposedly Nancy

25   would know that Trino would come or something, and

1    Nancy was not there.

2        Q    So the individual's name was Trino?

3        A    Yes.

4        Q    You also said another gentleman.  What is

5    the name of that gentleman that you were referring

6    to?

7        A    I don't know.  It might be Pedro.  There

8    are a lot of people.

9        Q    I am trying to determine who your

10   witnesses are.  So Pedro who?

11       A    I don't know his last name.

12       Q    What is his relationship with you?

13       A    He was living behind my house at the ship.

14       Q    And you don't know his name?

15       A    Pedro.

16       Q    But you don't know his last name?

17       A    No.

18       Q    Do you have a written contract with Pedro?

19            MR. WHISENAND:  Objection to form.

20            THE WITNESS:  He doesn't work with me.  He

21   is a friend.

22       Q    He still is currently living behind your

23   house?

24       A    He left two months ago.

25       Q    And you don't know where he is currently

```
1    living?
2           MR. WHISENAND:  Objection as to form.
3       A    Yes, in Spain.
4       Q    Who else do you believe has knowledge of
5    Nancy's hours that she worked for you?
6       A    No, no one else.  Myself, my children.
7    Trino, who would always come and Nancy wasn't
8    there.  Monica.
9       Q    And what is Monica's last name?
10      A    Monica would come to my house and the
11   house was empty and Nancy had left, and she did
12   not lock the door with a key.  And other times,
13   they would press the bell, and no one was there,
14   no one.  She lived alone.  Nancy was alone.  And
15   she would go out.
16      Q    What is Monica's last name?
17      A    Fomperosa, F-O-M-P-E-R-O-S-A.
18      Q    Do you know Monica's address?
19      A    No.  She lives in Key Biscayne.
20      Q    And then you said someone else.  I cut you
21   off.  I apologize.
22           MR. WHISENAND:  Objection as to form.
23           THE WITNESS:  Paula Curutchet.
24      Q    Can you spell her last name for me,
25   please?
```

```
 1        A    C-U-R-U-T-C-H-E-T.

 2        Q    And what is her relationship to you?

 3        A    Friend.

 4        Q    She lives in Key Biscayne, as well?

 5        A    Yes.

 6        Q    Do you know her address?

 7        A    No.

 8        Q    Is she a neighbor of yours?

 9        A    One block.

10        Q    Is there anyone else that you haven't

11   mentioned?

12             MR. WHISENAND:  Objection as to form.

13             THE WITNESS:  Yes.  Ali Raom.

14        Q    Can you spell that for us, please?

15        A    These are the persons who can say Nancy's

16   schedule.

17        Q    Correct.

18        A    Ali Raom.  Ali, last name is R-A-O-M,

19   Raom.

20        Q    Who is Ali Raom?

21             THE INTERPRETER:  Oh, I'm sorry.  It's

22   R-H-O-M, Ali Rhom.

23             THE WITNESS:  A female friend.

24        Q    And she lives in Key Biscayne, as well?

25        A    Now, in Argentina.
```

```
 1        Q    Anyone else, ma'am, that you haven't
 2   mentioned?
 3             MR. WHISENAND:  Objection as to form.
 4             THE WITNESS:  Yes, but I don't recall
 5   anymore.  I don't remember.
 6        Q    Did you ever consult with the Department
 7   of Labor or an attorney to ensure you that were in
 8   compliance with the overtime and minimum wage
 9   laws?
10             MR. WHISENAND:  Objection as to form.
11             THE WITNESS:  For Esther?
12        Q    No, just generally.
13             MR. WHISENAND:  Objection as to form.
14             THE WITNESS:  No.  The only one was
15   Esther.  And it was okay.  It is what she wanted
16   per hour.
17        Q    Did you ever consult with the Department
18   of Labor or with an attorney or anyone else with
19   regards to ensuring that you were paying Nancy in
20   compliance with the minimum wage laws?
21             MR. WHISENAND:  Objection as to form.  If
22   you had any communications with -- please wait.
23        A    Nancy, I don't consider her a worker.
24   It's friendly.  She lives in my house.  I don't
25   live there for two years.  She lived there.  She
```

1    sleeps in my room.  I don't know what she does.

2       Q    Prior to the lawsuit, did you ever consult

3    with the Department of Labor, an attorney or

4    anyone else to ensure --

5            MR. WHISENAND:  Please divide those

6    questions.

7            MS. JAFF:  Sure.

8            MR. WHISENAND:  Thank you.

9       Q    Prior to this lawsuit, did you ever

10   consult with the Department of Labor to ensure

11   that you were paying your employees in compliance

12   with the minimum wage laws?

13           MR. WHISENAND:  Objection to form.

14           THE WITNESS:  I have no employees.  It was

15   only Esther with the price that everyone is paying

16   and that she asked for.  That is all.

17      Q    Prior to the lawsuit, did you ever consult

18   with the Department of Labor to ensure that you

19   were paying Nancy in compliance with the minimum

20   wage laws?

21           MR. WHISENAND:  Objection as to form.

22           THE WITNESS:  Nancy, her I don't put in

23   the same place as Esther.  One is a worker.  The

24   other one, no.  The other one has privileges in my

25   house.  That is, I am saying, June, July and

 1   August, alone.  If she doesn't, she can leave.

 2        Q    Is your answer no, you never consulted

 3   with the Department of Labor prior to the lawsuit

 4   to ensure you were paying Nancy in compliance with

 5   the minimum wage laws?

 6             MR. WHISENAND:  Objection as to form.

 7             THE WITNESS:  I am not going to put Nancy

 8   in the minimum payment laws, because she doesn't

 9   figure in that.  She is not an employee.

10        Q    So you did not consult with the Department

11   of Labor; is that correct?

12             MR. WHISENAND:  Objection as to form.

13             THE WITNESS:  No.

14        Q    Prior to the lawsuit, did you consult with

15   an attorney to ensure that you were paying Nancy

16   in compliance with the minimum wage laws?

17        A    But she is not an employee, Nancy.  Why do

18   you take her on the side of being an employee?

19   She lives in my house.  She vacations, June, July,

20   August.  She can live in my house if she wishes,

21   or not if she doesn't wish to.  She has a key.

22   She can do whatever she wants.  Why do you put her

23   as an employee, as if she had a schedule?

24        Q    So prior to this lawsuit, you did not

25   consult with an attorney to ensure that you were

1  paying Nancy in compliance with the minimum wage

2  laws, correct?

3           MR. WHISENAND:  Wait before you answer.

4           MS. JAFF:  She was instructed not to

5  answer the question.  So instruct her not to

6  answer the question.

7           Now wait one second.  Can you please state

8  the basis for your objection on the record?

9           MR. WHISENAND:  Yes.  You are intruding

10  into attorney-client privilege.

11          MS. JAFF:  I am going to certify that

12  question, because you have raised a good-faith

13  defense, and I am entitled to explore whether or

14  not that was advice that she received from counsel

15  prior to the lawsuit.  Do you want to maintain

16  your objection or can I reask it and you will

17  instruct her to answer?

18          MR. WHISENAND:  For simplicity's sake, I

19  will let her answer the question.

20          MS. JAFF:  I will reask the question.

21          THE INTERPRETER:  So I am saying you can

22  answer the question?

23          MS. JAFF:  Correct.

24     Q    I am going to reask my question.  Prior to

25  the lawsuit, did you consult with an attorney

1    regarding compliance with the minimum wage laws as

2    it related to your payments to Nancy?

3              MR. WHISENAND:  Objection as to form.

4              THE WITNESS:  I am not going to answer the

5    question because you are putting Nancy in a place

6    of being an employee, which she is not.

7         Q    So you are refusing to answer my question?

8              MR. WHISENAND:  She answered your

9    question.

10             THE WITNESS:  Yes.  Because you are

11   talking to me about a work from a person who is

12   not Nancy.  Nancy has no schedule.  Nancy does

13   whatever she wants.  Nancy eats and travels.

14   Nancy has vacations in my house.  So this is not

15   an employee law that you are talking about.

16        Q    Did you consult with an attorney prior to

17   the lawsuit about what you just said, to see

18   whether or not your understanding of the law was

19   correct?

20             MR. WHISENAND:  Objection as to form.

21             THE WITNESS:  Could you reformulate the

22   question?  I don't understand it.

23        Q    You just said that Nancy should not be

24   considered someone who you had to -- strike that.

25   I will just reask my question completely.

1          Did you or did you not consult with an

2    attorney prior to the lawsuit to determine whether

3    or not your payment to Nancy was in compliance

4    with the minimum wage laws?

5          MR. WHISENAND:  Objection as to form.

6          THE WITNESS:  Again, about Nancy.  No,

7    Nancy doesn't have anything to do with the minimum

8    payment law for an employee.

9    Q    And you did not consult with an attorney

10   to get that understanding?

11         MR. WHISENAND:  Objection as to form.

12         THE WITNESS:  To my best recall, no.  I

13   don't remember.

14   Q    Do you know what minimum wage is?

15         MR. WHISENAND:  Objection as to form.

16         THE WITNESS:  No.

17   Q    For the past five years, you have not

18   known what minimum wage is?

19   A    No.

20         MR. WHISENAND:  Objection as to form.

21   Q    Have you ever consulted with the

22   Department of Labor with regards to what minimum

23   wage is?

24   A    No.

25         MR. WHISENAND:  Objection as to form.

```
 1              THE INTERPRETER:  Is it okay if I just
 2    don't repeat that every single time right now?
 3              MR. WHISENAND:  In most depositions,
 4    translators translate what is said for the
 5    witness, so the witness has that opportunity.
 6    It's not my deposition.
 7        Q    Did Nancy have her own phone?
 8              MR. WHISENAND:  Objection as to form.
 9              THE WITNESS:  Yes.
10        Q    Did you pay for that phone?
11        A    The one at the house, yes.
12        Q    The landline?
13        A    Yes.
14        Q    Did Nancy have a cell phone?
15        A    Yes, I think so.  Yes, she did.
16        Q    Did you pay for Nancy's cell phone?
17        A    No.
18        Q    Did you pay for Nancy's health insurance?
19              MR. WHISENAND:  Objection as to form.
20              THE WITNESS:  I don't know if she had
21    insurance.  But some things.  I had given her
22    little gifts for molars or something that she
23    needed medical.
24        Q    Did you pay for any tickets for Nancy?
25              MR. WHISENAND:  Objection as to the form.
```

```
1      A    Passage, transportation, a plane?
2      Q    Travel tickets?
3           MR. WHISENAND:  Objection as to form.
4           THE WITNESS:  No.
5      Q    Did you pay for any vacations for Nancy?
6      A    Yes.  She always had the salary and she
7  did whatever she wanted.  Yes, I gave her money,
8  yes.
9      Q    What vacations did you pay for Nancy?
10          MR. WHISENAND:  Objection as to form.
11          THE WITNESS:  When I wasn't there on June,
12 July and August, I would leave all the money in
13 advance, all in one day, and gifts where I would
14 give her money.
15          THE INTERPRETER:  It's 1:30.  Is it
16 possible to take a break?
17          (A discussion was held off the record.)
18          MS. JAFF:  I am happy to take a break now
19 if you want, but I would rather just finish.
20          MR. WHISENAND:  Can you wait 15 minutes?
21          THE INTERPRETER:  Okay.
22          MR. WHISENAND:  Thank you.
23 BY MS. JAFF:
24     Q    What affirmative steps did you take, if
25 any, to verify whether or not you were paying
```

1    Nancy in accordance with the minimum wage laws?

2        A    Nancy, I don't put her.  I don't put her

3    within the laws of minimum payment because she is

4    not my employee.

5            MR. WHISENAND:  Objection as to form.

6        Q    So there are no affirmative steps that you

7    took to verify whether you were paying Nancy in

8    accordance with the minimum wage laws?

9            MR. WHISENAND:  Objection as to form.

10           THE WITNESS:  Being an employee, no.  It's

11   an agreement where she was using the house and she

12   was living there.  She could leave or not if she

13   wished, and she could buy whatever she wanted.

14   She walked if she wanted to.  She could go out

15   whenever she wanted.  She could speak on the

16   phone.

17       Q    Did you ever tell Nancy that the value of

18   the food and her living space were part of her

19   wages?

20       A    No.  The agreement with Nancy was about

21   money.  Not to pay for the room or the food.

22       Q    On your taxes, how do you reflect the

23   amount of wages that you pay to Nancy?

24           MR. WHISENAND:  Objection as to form.

25           THE WITNESS:  It's not in the taxes.

```
 1        Q    And that is true for the year 2012 through
 2   and including 2016?
 3        A    Yes.
 4        Q    I think that you had said that Nancy, on
 5   the weekends, sometimes went and stayed with her
 6   boyfriend; is that correct?
 7        A    I did not say boyfriend.  You mean Nancy's
 8   boyfriend?
 9        Q    Yes.  Maybe I misunderstood you.
10        A    No, you didn't understand well.  I don't
11   know if this was the boyfriend.  Nancy was in my
12   house and when I traveled, she stayed in my house.
13   If she wanted, she could leave.  I don't have
14   control over Nancy.
15        Q    Did you provide Nancy with all the
16   materials that she used in order to complete her
17   job duties?
18             MR. WHISENAND:  Objection as to form.
19             THE WITNESS:  No.  She would buy her food,
20   whatever she needed.  I don't know.  I didn't look
21   at it.  I don't look.
22        Q    Was Nancy required to buy her own cleaning
23   supplies in order to clean your house?
24        A    No.  I would buy those for my house, and
25   Nancy, whatever she would need, shampoo or soap,
```

1    she would buy.

2        Q    So you would provide Nancy with all of the

3    materials that she needed in order to complete her

4    job duties, for example, cleaning supplies,

5    detergent?

6            MR. WHISENAND:  Objection.

7            THE WITNESS:  Sometimes, yes.  Sometimes

8    Nancy.

9        Q    For example, what did Nancy purchase to do

10   her job with her own money.

11       A    No.  Nancy, nothing.  With her money,

12   Nancy had no money.

13       Q    So sometimes Nancy would purchase the

14   items using the money that you had provided to her

15   in order to buy the materials to complete her job

16   duties?

17           MR. WHISENAND:  Objection as to form.

18           THE WITNESS:  Nancy would not spend her

19   money.  Everything was bought with my money.

20       Q    Did Nancy have the option of not living in

21   your house, but still working for you?

22           MR. WHISENAND:  Objection as to form.

23           THE WITNESS:  Yes.

24       Q    And you told her that?

25       A    Yes.

```
1       Q    When did you tell her that?
2       A    When she told me that she wanted to go
3   move to New York to live there, at the end of
4   2016.  I told her if she wanted to work with a
5   friend of mine, with a room that my friend would
6   provide for her to work with a good salary, or
7   stay in my house and to come whenever I need her,
8   and that she should not be afraid.  If she went to
9   New York and she didn't like it there, I have two
10  beds and she can stay without any commitment of
11  any type.
12      Q    When Nancy didn't stay at your house, do
13  you know where she stayed?  For example, the
14  weekends or any days off.
15           MR. WHISENAND:  Objection as to form.
16           THE WITNESS:  Look, I don't know if she
17  left on the weekends or not.  I have no idea.
18      Q    Did you deduct on your taxes the value of
19  the room and board?
20           MR. WHISENAND:  Objection as to form.
21           THE WITNESS:  To whom?
22      Q    The room and board that you provided to
23  Nancy, did you deduct that on your tax returns in
24  any of the years that Nancy was with you?
25           MR. WHISENAND:  Objection as to form.
```

```
1              THE WITNESS:  No, no.  Me, about my taxes,
2    I don't deduct anything.  I just pay.
3        Q    Did you ever declare on your taxes the
4    rent that you were charging Nancy to stay with
5    you?
6              MR. WHISENAND:  Objection as to form.
7              THE WITNESS:  I was not charging Nancy any
8    rent.
9        Q    Did you ever deduct the cost of meals or
10   rent as expense on your tax returns?
11             MR. WHISENAND:  Objection as to form.
12       A    No.
13       Q    Did you ever declare the room and board as
14   income for services rendered or otherwise on your
15   tax returns?
16             MR. WHISENAND:  Objection as to form.
17             (The record was read by the court
18   reporter.)
19             THE WITNESS:  Wait, this was the one about
20   income for services rendered or otherwise, that
21   phrase.
22             MR. WHISENAND:  Write down, please, now
23   that you are not transcribing what the interpreter
24   says to you from time to time.  Would you from now
25   on please do that?
```

```
 1              THE COURT REPORTER:  Yes.

 2              MR. WHISENAND:  Thank you.

 3        Q     I will ask reask my question.

 4              Did you ever declare as income for

 5    services rendered or otherwise while Nancy worked

 6    for you on your taxes?

 7              MR. WHISENAND:  Objection as to form.

 8              THE WITNESS:  Excuse me.  Don't

 9    understand.  She didn't work for me.  I said it 20

10    times.  What you are saying about taxes, I never

11    deducted food, house, employees, anything that you

12    are saying, nothing, nothing.  I don't deduct

13    taxes.  I pay them.  But I don't do deductibles

14    about anything.  So that you don't keep asking,

15    you know.

16        Q     Did Nancy have any special skills?

17        A     To my knowledge, normal.

18        Q     Did Nancy need to be available whenever

19    you needed to contact her?

20        A     No.

21        Q     Did Nancy have the opportunity for profit

22    or loss depending on her managerial skills?

23              MR. WHISENAND:  Objection as to form.

24              THE WITNESS:  Excuse me.  I didn't

25    understand.
```

1    Q    I will reask it.  Did Nancy have the

2    opportunity for profit or loss depending on her

3    managerial skills?

4         MR. WHISENAND:  Objection as to form.

5         THE WITNESS:  I told Nancy that she should

6    take the advantage to look around, to look for, in

7    a comfortable house, for an opportunity to be paid

8    more money and that she should go out to work.

9    Q    My question is, the quicker Nancy got

10   through her tasks, did she have an opportunity to

11   make more money?

12        MR. WHISENAND:  Objection as to form.

13        THE WITNESS:  If she wanted more money, it

14   would be asked for.  She would ask for more money.

15   Q    What was the last day that Nancy worked

16   for you?

17   A    I was in the country, in Wellington.  It

18   must have been in December.  I don't know because

19   she said she left the keys with a friend, and she

20   left.  So I don't know.  It was around

21   December 19th.  I was in the country and she

22   told me that she was leaving.  In the farm, I

23   myself.  And she told me that she would leave at

24   the end of December.

25   Q    And that was December 2016?

1      A      Yes.

2      Q      So Nancy quit?

3      A      Yes.  She was alone since the 19th of

4    December when I left.  And she said -- she told me

5    on the phone that she was going to New York to

6    live, and she cried on the phone.  And I gave her

7    a gift of some money, so that if she did not find

8    work in New York, she could do something.  That if

9    when things went bad, someday she could come back.

10   She could come back and live in my house, and I

11   would not charge for the roof or for anything, and

12   find herself a job.

13     Q      Okay.  Will you give me a minute just to

14   look over my notes and make sure I don't have

15   anything else?

16     A      Uh-huh.

17     Q      Did you ever offer Nancy more money in her

18   wages to cover transportation if she did not want

19   to live in your house?

20          MR. WHISENAND:  Objection as to form.

21          THE WITNESS:  No.  Nancy would do whatever

22   she wanted and she would ask me for whatever she

23   wanted.  Just the same as I gave her $2,000 for

24   the coffin of her granddaughter.  She would ask me

25   for money whenever she needed it and whatever she

1    wanted.

2      Q    But you didn't offer that, right?

3           MR. WHISENAND:  Objection as to form.

4           THE WITNESS:  Excuse me?  What was the

5    question?

6      Q    You didn't offer more money to Nancy to

7    cover the cost of transportation so that she

8    didn't have to live in your house?

9           MR. WHISENAND:  Objection as to form.

10          THE WITNESS:  No.  She wanted to be in Key

11   Biscayne.  She was happy in Key Biscayne.  And I

12   did offer her in December that if she wanted to

13   stay in the house where I lived -- I never live

14   there.  I am there super seldom.  To work for

15   herself and live in my house, and if she wanted

16   more money I would give it to her.  And she said

17   she didn't want more money.  She wanted to go to

18   New York.

19     Q    Ma'am, I am going to mark this as Exhibit

20   A.

21          MR. WHISENAND:  Do you have a copy?

22          MS. JAFF:  No, but I can get you one if

23   you give me a moment.

24     Q    Have you seen that document before?

25          MR. WHISENAND:  Are you going to mark

1    this?

2         MS. JAFF:  Yes, I just did.

3    Q    Have you ever seen that before, ma'am?

4    A    I don't believe so.

5    Q    Do you remember ever getting a letter from

6    our law firm?

7    A    Yes, but here there was a Z.  There was a

8    logo with a Z.  This is not the letter.

9         MR. WHISENAND:  You are not giving her the

10   document that you say you sent her.

11        MS. JAFF:  I am asking her if she can

12   identify it.  If she can't, then for the record

13   she didn't identify it.

14        MR. WHISENAND:  You should offer the

15   document that you sent.

16        THE WITNESS:  No, that is not the one.

17        MS. JAFF:  Could you mark this.

18        (Plaintiff's Exhibit Number

19      A was marked by the court reporter and is

20      attached to the end of the transcript.)

21   Q    Ma'am, you had provided us with copies of

22   calendars?

23   A    Uh-huh.

24   Q    What you do you believe those calendars

25   show that you have provided them?

```
 1       A    No.  For me, it's organizing in my head

 2   and to know since I travel a lot and so do my

 3   children.  Since we are in the U.S. very little,

 4   to know more or less how many days I live outside,

 5   because I live more days outside than in, and I

 6   count them.

 7            And then my husband lives in another

 8   country, and he cannot be in the United States

 9   more than 100, 120 years.  Of course, he is not

10   American.  So I count.  I look at the trips my

11   children take.  I know when they go to London.

12   It's just organization.

13       Q    So the calendars don't show the hours that

14   Nancy worked?

15       A    No.

16            MS. JAFF:  I have no other questions.  Do

17   you have questions?

18            MR. WHISENAND:  No.  Thank you very much.

19            MS. JAFF:  Are you going to read or waive?

20            MR. WHISENAND:  We are going to read.

21            MS. JAFF:  I just wanted to ask, my

22   question is I know that Alan has filed his notice

23   of appearance.  Have you?

24            MR. WHISENAND:  I think it's with the

25   Court.  The on document, you will find my
```

1    signature.

2         MS. JAFF:  Is that yes, you filed a notice

3    of appearance?

4         MR. WHISENAND:  You can look at the

5    document and make your own conclusion.

6         MS. JAFF:  You can't, sitting here today,

7    tell us if you filed a notice of appearance?

8         MR. WHISENAND:  Ma'am, I have signed

9    documents that are there.  Thank you very much.

10        MS. JAFF:  You can file documents on the

11   record without filing a notice of appearance.

12        MR. WHISENAND:  You have a docket sheet.

13   We do.  Thank you very much.

14        MS. JAFF:  Okay.  Well, I am putting on

15   the record that if he hasn't filed his notice of

16   appearance, we are asking him to please file his

17   notice of appearance.

18        MR. WHISENAND:  Thank you very much.  Have

19   a good day.

20        THE INTERPRETER:  Thank you.

21        MR. WHISENAND:  Can we get a copy of that

22   before we leave, please?  Exhibit Number 1, yes,

23   please.

24        MS. JAFF:  Sure.

25        (Ending time:  1:55 p.m.)

```
 1
 2                        CERTIFICATE OF OATH
 3

 4     STATE OF FLORIDA     )
                            ) SS:
 5     COUNTY OF MIAMI-DADE)

 6

 7           I, ROCHEL ALBERT, Certified Shorthand

 8     Reporter and Notary Public in and for the State of

 9     Florida at Large, certify that the witness,

10     personally appeared before me and was duly sworn.

11

12           WITNESS my hand and official seal this

13     30th day of September, 2017.

14

15           _____

16                        ROCHEL ALBERT, CSR
                          Notary Public, State of
17                        Florida

18

19

20

21

22

23

24

25
```

```
 1
 2              REPORTER'S DEPOSITION CERTIFICATE
 3
 4         I, ROCHEL ALBERT, Certified Shorthand
 5    Reporter, certify that I was authorized to and did
 6    stenographically report the foregoing deposition;
 7    that the foregoing transcript of said witness is a
 8    true and complete record of my stenographic notes of
 9    the deposition by said witness; and that this
10    computer-assisted transcript was prepared under my
11    supervision.
12         I further certify that I am not a
13    relative, employee, attorney or counsel of any of
14    the parties, nor am I a relative or employee of any
15    of the parties, attorney or counsel connected with
16    the action.
17         DATED this 30th day of September, 2017.
18
19
20         _____
21         ROCHEL ALBERT, CSR
           Notary Public, State of Florida
22         at Large.  My commission expires
           September 4, 2021.  Bonded
23         COMMISSION # GG 102558
24
25
```

1                          CORRECTION SHEET

2              RE:  CHAVEZ V. ARANCEDO
               CASE NO. 17-20003-CIV-JLK
3              DEPO OF: BERNARDA M ARANCEDO
               DATE TAKEN:  August 25, 2017
4

5         PAGE/LINE NO:          CORRECTION OR CHANGE

6         _____

7         _____

8         _____

9         _____

10        _____

11        _____

12        _____

13        _____

14        _____

15        _____

16        _____

17        _____

18

19                   _____

20                           WITNESS

21             Sworn to and subscribed to before me this
          ____ day of _____, 2017.

22

23        _____
          Notary Public in and for the
24        State of Florida at Large.

25

```
 1                DEPO EXPRESS REPORTING, INC.
                       1240 N.E. 176 Street
 2                 North Miami Beach, Florida 33162
                           (305) 305-3333
 3

 4       October 3rd, 2017

 5       To:  BERNARDA M ARANCEDO, c/o
               ALAN LEMURA, ESQ.
 6             JAMES D. WHISENAND, ESQ
               WHISENAND & TURNER, P.A.
 7             501 Brickell Key, Suite 602
               Miami, Florida  33131
 8

 9

10             RE:  CHAVEZ V. ARANCEDO
               CASE NO. 17-20003-CIV-JLK
11             DEPO OF: BERNARDA M ARANCEDO
               DATE TAKEN:  August 25, 2017
12
         Dear Ms. Arancedo,
13
         Your transcript from the above-referenced case is
14       ready to be read and signed by you.

15       Please contact my office to make arrangements at
         your earliest convenience to make an appointment
16       to read and sign your original transcript.
         The original transcript will be forwarded to the
17       attorney who ordered it in 15 days or at the time
         of trial, whichever comes first, with or without
18       your signature.

19       Your prompt attention to this matter is greatly
         appreciated.
20

21
         Sincerely,
22

23       Rochel Albert, Court Reporter
         Depo Express Reporting
24

25
```