# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 17-20003-Civ-TORRES

NARCISA PEREZ CHAVEZ,

    Plaintiff,

v.

BERNARDA M. ARANCEDO,

    Defendant.

_____/

## ORDER ON PLAINTIFF'S *DAUBERT* MOTION

This matter is before the Court on Narcisa Perez Chavez ("Plaintiff") *Daubert* motion against Bernarda M. Arancedo's ("Defendant") expert witness, Thania Vernon ("Ms. Vernon"). [D.E. 65]. Defendant responded to Plaintiff's motion on July 16, 2018 [D.E. 74] to which Plaintiff replied on July 19, 2018. [D.E. 75]. Therefore, Plaintiff's motion is now ripe for disposition. After careful consideration of the motion, response, reply, relevant authority, and for the reasons discussed below, Plaintiff's motion is **GRANTED**.

### *I.    BACKGROUND*

Plaintiff filed this action on January 2, 2017 and alleges that Defendant violated the Fair Labor Standards Act ("FLSA") and the Florida Minimum Wage Act ("FMWA"). Plaintiff claims that she had an employee relationship with Defendant from January 23, 2012 through December 30, 2016. Plaintiff's earnings purportedly fell below the Federal and Florida minimum wage for the services she

1

performed as a maid at Defendant's personal residence. Defendant denies all of Plaintiff's allegations and the matter is currently set for trial on October 9, 2018 with a discovery deadline of June 28, 2018. [D.E. 32].

## *II. APPLICABLE LEGAL PRINCIPLES AND LAW*

The decision to admit or exclude expert testimony is within the trial court's discretion and the court enjoys "considerable leeway" when determining the admissibility of this testimony. *See Cook v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1103 (11th Cir. 2005). As explained in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), the admissibility of expert testimony is governed by Fed. R. Evid. 702.[1] The party offering the expert testimony carries the burden of laying the proper foundation for its admission, and admissibility must be shown by a preponderance of the evidence. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999); *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion, whether the proponent is the plaintiff

---

[1] Rule 702 states the following:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

2

or the defendant in a civil suit, or the government or the accused in a criminal case.").

"Under Rule 702 and *Daubert*, district courts must act as 'gate keepers' which admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (citing *Daubert*, 509 U.S. at 589). The purpose of this role is "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). Also, in its role as "gatekeeper," its duty is not "to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)

To facilitate this process, district courts engage in a three part inquiry to determine the admissibility of expert testimony:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa*, 158 F.3d 548, 562 (11th Cir. 1998) (citations omitted). The Eleventh Circuit refers to the aforementioned requirements as the "qualification," "reliability," and "helpfulness" prongs and while they "remain distinct concepts"; "the courts must take care not to conflate them." *Frazier*, 387 F.3d at 1260 (citing *Quiet Tech*, 326 F.3d at 1341).

Furthermore, in determining the *reliability* of a scientific expert opinion, the Eleventh Circuit considers the following factors to the extent possible:

3

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. Notably, however, these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis.

*Quiet Tech*, 326 F.3d at 1341 (citations omitted). The aforementioned factors are not "a definitive checklist or test," *Daubert*, 509 U.S. at 593, but are "applied in case-specific evidentiary circumstances," *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005). While this inquiry is flexible, the Court must focus "solely on principles and methodology, not on conclusions that they generate." *Daubert*, 509 U.S. at 594-95. It is also important to note that a "district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.'" *Quiet Tech*, 326 F.3d at 1341 (quoting *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001)). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking but admissible evidence." *Daubert*, 509 U.S. at 580; *see also Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014) ("As gatekeeper for the expert evidence presented to the jury, the judge 'must do a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'") (quoting *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010)).

## III.   ANALYSIS

Plaintiff's *Daubert* motion is aimed at Defendant's expert, Ms. Vernon[2], on the basis that she is unqualified to render any opinions in this case. Defendant seeks to use Ms. Vernon at trial in support of her affirmative defenses that Defendant is entitled to a cost credit for Plaintiff's room that she occupied at Defendant's Key Biscayne residence. Defendant suggests that the cost credit should be used to reduce any wages that Plaintiff may be entitled to under the FLSA if Plaintiff is determined to be an eligible employee.

Plaintiff argues that Ms. Vernon cannot be used as an expert for several important reasons. First, Plaintiff contends that Ms. Vernon used the wrong standard in a FLSA case. Ms. Vernon purportedly used a "reasonable monthly value" standard in her expert report when the standard that should have applied was a "reasonable cost" to the employer. Second, Plaintiff claims that Ms. Vernon must be excluded because she did not (1) inspect the premises before issuing her opinion, (2) review a single electric/water/cable bill, or (3) review the public records as to whether there was a mortgage on the property. Third, Plaintiff suggests that Ms. Vernon's analysis was not based on any reliable principles or methods nor did the expert opinion cover the relevant time period. Plaintiff concludes that Ms. Vernon's opinions are inadmissible because (1) they will not assist the trier of fact,

---

[2]  Ms. Vernon is a real estate broker who has specialized in the Key Biscayne real estate market for over 30 years. In Ms. Vernon's expert report, she provides a broker's price opinion on the fair value of the room that Plaintiff occupied during the years 2012-2016 and 2018. A comparative rental pricing analysis was used to determine the fair value of the room.

(2) they are unreliable and unsupported by any methodology, and (3) Ms. Vernon is unqualified. Accordingly, Plaintiff seeks to strike Ms. Vernon as an expert witness because she fails to satisfy any of the requirements under Fed. R. Evid. 702, 703, or *Daubert*.

### A. *Qualifications*

Plaintiff does not dispute that Ms. Vernon has nearly three decades of experience as a broker specializing in real estate. But, Plaintiff claims that Ms. Vernon is unqualified to be an expert in this case because she has never (1) testified as an expert, (2) taught any classes in real estate, or (3) published anything related to the FLSA. Defendant's response is that experts may be qualified in various ways. While scientific training or education provides the most common ways of establishing that an expert is qualified, Defendant argues that experience in a particular field may offer another path to expert status. Defendant also suggests that the qualification standard is not stringent and that any objections to the level of Ms. Vernon's expertise should go to her credibility and weight, not admissibility." *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.,* 674 F.Supp.2d 1321 (S.D. Fla. 2009) (citation omitted).

An expert may be qualified to testify in multiple ways: "'by knowledge, skill, experience, training, or education'" and "not necessarily unqualified simply because her experience does not precisely match the matter at hand." *Furmanite Am., Inc.*, 506 F. Supp. 2d at 1129 (citing *Maiz,* 253 F.3d at 665, 669). "Determining whether a witness is qualified to testify as an expert 'requires the trial court to examine the

6

credentials of the proposed expert in light of the subject matter of the proposed testimony.'" *Clena Investments, Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (quoting *Jack v. Glaxo Wellcome, Inc.,* 239 F.Supp.2d 1308, 1314–16 (N.D. Ga. 2002)). "In other words, a district court must consider whether an expert is qualified to testify competently regarding the matters he intends to address." *Clena Investments, Inc.*, 280 F.R.D. at 661 (citing *City of Tuscaloosa,* 158 F.3d at 562–63).

Determining an expert's qualifications is not a stringent inquiry "and so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (citations omitted); *see also Johnson v. Big Lots Stores, Inc.,* 2008 WL 1930681, *14 (E.D .La. Apr. 29, 2008) (summarizing *Rushing v. Kansas City S. Ry. Co.,* 185 F.3d 496, 507 n. 10 (5th Cir. 1999), as "explaining that after an individual satisfies the relatively low threshold for qualification, the depth of one's qualification may be the subject of vigorous cross-examination"); *see also Martinez v. Altec Indus., Inc.,* 2005 WL 1862677, *3 (M.D. Fla. Aug. 3, 2005) (quoting *Rushing,* 185 F.3d at 507 ("As long as some reasonable indication of qualifications is adduced . . . qualifications become an issue for the trier of fact rather than for the court in its gate-keeping capacity")). After a review of the relevant issues and an expert's qualifications, "the determination regarding qualification to testify rests within the district court's

7

discretion." *Clena Investments, Inc.*, 280 F.R.D. at 661 (citing *Berdeaux v. Gamble Alden Life Ins. Co.,* 528 F.2d 987, 990 (5th Cir. 1976) (footnote omitted)).

Ms. Vernon's lack of experience in litigation is not, by itself, enough to exclude her as a witness. While Ms. Vernon has never participated in a FLSA case, her twenty-seven years of experience in real estate qualifies her as an expert in determining the market value of the room that Plaintiff occupied during her work as a maid. *See, e.g.*, *Nature's Prod., Inc. v. Natrol, Inc.*, 2013 WL 11275370, at *4 (S.D. Fla. Oct. 8, 2013) ("Although he has never been published or testified as an expert–and his educational background is not included in the report–his experience in the branding field constitutes sufficient qualification for testimony regarding branding.") (citing *United States v. Cordoba,* 2012 WL 3620306, at *3–4 (S.D. Fla. Aug. 21, 2012) (holding that "on-the-job experience" could suffice to qualify an expert "under the relatively low qualifications threshold of Daubert")). Ms. Vernon has valued properties on the same street that Plaintiff occupied during her employment at Defendant's residence, meaning she has specialized knowledge on the value of real estate properties in the area. Because of Ms. Vernon's experience in determining the value of real estate properties, Plaintiff's argument that Ms. Vernon is unqualified is **DENIED**.

## B. *Reliability*

Plaintiff's next argument is that Ms. Vernon's opinions and testimony are inadmissible because she relied on almost no data in her expert report and that she reviewed only two property listing sheets in the Key Biscayne area. Plaintiff claims

8

that these listing sheets are inapposite because the properties are smaller in square footage than Defendant's home. Plaintiff also contends that Ms. Vernon's expert report is defective because she failed to (1) inspect the premises before issuing her opinion, (2) review a single electric/water/cable bill, or (3) review the public records as to whether there was a mortgage on the property. Therefore, Plaintiff concludes that Ms. Vernon's expert opinion is not based on any facts or data and must be excluded as unreliable.

"The reliability standard is established by Rule 702's requirement that an expert's testimony pertain to 'scientific . . . knowledge,' since the adjective 'scientific' implies a grounding in science's methods and procedures, while the word 'knowledge' connotes a body of known facts or of ideas inferred from such facts or accepted as true on good grounds." *Daubert*, 509 U.S. at 580. This entails an assessment of whether the "methodology underlying the testimony is scientifically valid." *Id.* at 592. The four non-exhaustive factors used to evaluate the reliability of a scientific expert opinion include the following:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

*Frazier*, 387 F.3d at 1262 (citations omitted).

"Notably, however, these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule

9

702 analysis." *Quiet Tech,* 326 F.3d at 1341. When determining whether a party has met its burden, "[a] trial judge has 'considerable leeway' in deciding how to determine when a particular expert's testimony is reliable and how to establish reliability." *Coconut Key Homeowners Ass'n, Inc. v. Lexington Ins. Co.,* 649 F.Supp.2d 1363, 1371 (S.D. Fla. 2009) (quoting *Graff v. Baja Marine Corp.,* 310 F. App'x 298, 302 (11th Cir. 2009)). Accordingly, "[t]o the extent that expert opinions are derived from literature review, witness interviews and data analysis, they are not automatically rendered unreliable by their non-susceptibility to empirical verification." *United States v. Levinson,* No. 10–80166–CR, 2011 WL 1467225, at *4 (S.D.Fla. Mar. 17, 2011) (citing *Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC,* 555 F.3d 1331, 1338 (11th Cir.2009)).

Plaintiff's arguments are unpersuasive because, after a thorough review of the underlying expert reports, we find that Ms. Vernon used a reliable methodology of comparable sales (and rentals) to determine what is generally accepted in the real estate community for Defendant's residence in the years 2012-2016 and 2018.[3] Ms. Vernon began her analysis with the per square footage rental rate of similar properties[4] during each of the relevant years by extrapolating data from listing

---

[3] This finding, of course, assumes that this methodology is relevant in this case. See, however, section C *infra*.

[4] These properties are residences that were for rent in the Key Biscayne area – some of which are within four blocks of Defendant's residence.

sheets. She then averaged[5] the rental rate per square footage and multiplied it by the approximate square footage of the room that Plaintiff used. This allowed Ms. Vernon to determine the average rental value of the room that Plaintiff used during her employment. While Ms. Vernon's expert report does not contain a plethora of data, Plaintiff's argument that the expert report is devoid of any support is unfounded.

As for Plaintiff's remaining arguments, we find that they are equally unpersuasive because it is not clear why Ms. Vernon was required to inspect the premises before issuing her opinion[6], review household utility bills, or review the public records to determine whether there was a mortgage on the property.[7] Plaintiff alleges that Ms. Vernon failed to perform these tasks, yet noticeably avoids any explanation on why they were required in the first place. And it is not clear to the Court how any of these tasks are relevant to the methodology of Ms. Vernon's expert report. Plaintiff also claims that the square footage of the comparable properties is not the same as Defendant's residence. Yet, that argument strikes at

---

[5] Ms. Vernon averaged the rental value of similar properties to account for any rate of error ascribed to their rental values.

[6] Defendant asserts that Ms. Vernon was not required to visit Defendant's home because she was already familiar with it and had knowledge of the surrounding area to determine its value.

[7] Plaintiff alleges that Ms. Vernon's expert opinion only provides values for the premises as of May 14, 2018 and not for the relevant time period that Plaintiff stayed on the premises from 2012 to 2016. But, Plaintiff's argument is unpersuasive because Ms. Vernon provided the rental value of Plaintiff's room during the relevant years in her supplemental expert report: (1) 2012 – $836 per month, (2) 2013 –$897.60 per month, (3) 2014 – $726 per month, (4) 2015 – $1,027.40 per month, (5) 2016 – $860.20 per month. [D.E. 74-2].

the credibility and weight of the expert report – not its admissibility. Because Ms. Vernon's expert report relies on a reliable methodology that approximates the value of the room that Plaintiff occupied during her employment with Defendant, Plaintiff's argument that the expert report's methodology is unreliable is **DENIED**.

### C. *Helpfulness*

Plaintiff's final argument is that Ms. Vernon's expert report is defective because she used an incorrect standard to approximate Defendant's cost credit. The standard that Ms. Vernon used was the fair value of Defendant's room. Yet, Plaintiff suggests that the correct standard is the reasonable cost to the employer. Because Ms. Vernon used the wrong standard, Plaintiff concludes that her expert report is unhelpful and must be excluded.

The helpfulness requirement "goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Quiet Tech. DC–8, Inc.,* 326 F.3d at 1347 (quoting *Daubert,* 509 U.S. at 591). In addition to being relevant, "expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person" and offers something "more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262-63 (citations omitted). While "[a]n expert may testify as to his opinions on an ultimate issue of fact . . . he 'may not testify as to his opinion regarding ultimate legal conclusions.'" *Umana-Fowler v. NCL (Bahamas) Ltd.*, 49 F. Supp. 3d 1120, 1122 (S.D. Fla. 2014) (quoting *Delatorre,* 308 F. App'x at 383). The Eleventh Circuit has made clear that "merely telling the jury

what result to reach is unhelpful and inappropriate." *Umana-Fowler*, 49 F. Supp. 3d at 1122 (citing *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990)).

The employer has the burden in showing that it is entitled to a cost credit under the FLSA and "[t]he regulations require employers to keep certain records of the cost incurred in furnishing board, lodging or other facilities . . . and also require the employer to maintain records showing additions or deductions from wages paid for board, lodging or other facilities on a work week basis." *New Floridian Hotel, Inc.*, 676 F.2d at 474 (citing 29 C.F.R. 516.28(b)); *see also Washington v. Miller*, 721 F.2d 797, 803 (11th Cir. 1983) ("The employer has the burden of showing that he is entitled to the credits claimed under § 3(m) of the FLSA.") (citing *New Floridian Hotel, Inc.,* 676 F.2d at 468). In situations where an employer has been unable to meet his or her burden, courts have denied these costs altogether. *See Washington*, 721 F.2d at 803 ("[T]o separate the reasonable cost of these facilities from the total cost plus profit would require the Court to speculate on the basis of an inadequate and inaccurate record. Under these circumstances, the *New Floridian* case requires that the Defendant be denied credit for the meals, wine, lodging and other facilities.").

The FLSA's "regulations provide only two ways to calculate the value of in-kind compensation—reasonable cost or fair value—and an employer must use whichever is less." *Balbed v. Eden Park Guest House, LLC*, 881 F.3d 285, 290 (4th Cir. 2018) (citing 29 C.F.R. § 531.3(c)). The authority for determining the

reasonable cost[8] or fair value lies with the Department of Labor. However, this is not the only permissible way to determine the reasonable cost or fair value under the FLSA's regulations, as employers are expressly allowed to make such determinations in accordance with specific instructions provided within the same set of regulations:

> Section 3(m) directs the Administrator to determine "the reasonable cost to the employer of furnishing facilities" to the employee, and in addition it authorizes him to determine "the fair value" of such facilities for defined classes of employees and in defined areas, which may be used in lieu of the actual measure of the cost of such facilities in ascertaining the "wages" paid to any employee.
>
> Subpart B contains three methods whereby an employer may ascertain whether any furnished facilities are a part of "wages" within the meaning of section 3(m): (1) An employer may calculate the "*reasonable cost*" of facilities in accordance with the requirements set forth in § 531.3*;* (2) an employer may request that a determination of "reasonable cost" be made, including a determination having particular application; and (3) an employer may request that a determination of "fair value" of the furnished facilities be made to be used in lieu of the actual measure of the cost of the furnished facilities in assessing the "wages" paid to an employee.

29 C.F.R. § 531.33(a).

Indeed, 29 C.F.R. § 531.3 explains to an employer how to make the determination of reasonable costs when an employer is not already subject to a determination by the Administrator:

---

[8] The regulations define "reasonable cost" "to be not more than the actual cost to the employer of the board, lodging, or other facilities customarily furnished by him to his employees." 29 C.F.R. § 531.3(a). "'Reasonable cost' does not include a profit to the employer or to any affiliated person." *Id.* § 531.3(b).

> Except whenever any determination made under § 531.4 is applicable, the "reasonable cost" to the employer of furnishing the employee with board, lodging, or other facilities (including housing) is the cost of operation and maintenance including adequate depreciation plus a reasonable allowance (not more than 5 1/2 percent) for interest on the depreciated amount of capital invested by the employer: Provided, That if the total so computed is more than the fair rental value (or the fair price of the commodities or facilities offered for sale), the fair rental value (or the fair price of the commodities or facilities offered for sale) shall be the reasonable cost. The cost of operation and maintenance, the rate of depreciation, and the depreciated amount of capital invested by the employer shall be those arrived at under good accounting practices.

29 C.F.R. § 531.3.

In this case, Ms. Vernon's expert report is defective because (1) she provided evidence of the fair value of Plaintiff's lodging *in the absence of the Department of Labor*, and (2) did so without a reasonable cost analysis. Beginning with the first defect, the FLSA's regulations only provide three methods to determine reasonable costs or fair value: (1) the employer may calculate the reasonable costs "in accordance with the requirements set forth in [29 C.F.R.] § 531.3," (2) the employer may request that a determination of reasonable costs be made by the Administrator, or (3) the employer may request that a determination of fair value be made by the Administrator. 29 C.F.R. § 531.33(a).[9] Although not specified, (2) and (3) require the Department of Labor to follow certain procedures,

---

[9] *See also Donovan v. Williams Chem. Co.*, 682 F.2d 185, 190 (8th Cir. 1982) ("First, the employer may calculate the 'reasonable cost' of furnishing facilities, 29 C.F.R. § 531.3. Second, the employer may petition the Wage and Hour Administrator of the Department of Labor to make a determination of the reasonable cost of furnishing the facilities, 29 C.F.R. s 531.4. Third, the employer may petition the Wage and Hour Administrator to determine the 'fair value' of the facilities and to use that determination in lieu of the actual cost of furnishing the facilities, 29 C.F.R. s 531.5.").

15

including publication of the proposed determination in the Federal Register for comment, and are therefore inapplicable to non-administrative determinations. Because Ms. Vernon determined the fair value of the room that Plaintiff occupied, without requesting that a determination be made by the Department of Labor, her expert report is unhelpful because it violates the procedural requirements of the FLSA's regulations.

The second reason Ms. Vernon's expert report is defective is because she failed to assess the actual cost[10] that Defendant pays for Plaintiff's housing. *See Reich v. Crockett*, 68 F.3d 469 (5th Cir. 1995) ("The employer may request that the Administrator of the Wage and Hour Division make a determination either as to the 'reasonable cost' or the 'fair value' of the housing furnished, or alternatively, an employer may calculate the 'actual cost' of the furnished housing pursuant to the requirements set forth in 29 C.F.R. § 531.3."). "[T]he regulations make clear that an employer may only use the fair value of housing as the amount credited toward wages if the fair value is *equal to or lower* than the amount the employer actually pays for the housing." *Balbed*, 881 F.3d at 290 (citing 29 C.F.R. § 531.3(c)).

Yet, Ms. Vernon never provided an actual cost analysis in her expert report – meaning there is no way of determining if the actual cost or the fair value assessment is lower. This means, that even if we ignore the prior defect, Defendant could not use Ms. Vernon's expert report (which is premised on fair value) because

---

[10] Actual costs of an employee's lodging are determined "by apportioning the monthly mortgage, rental payments, and utility payments." *Balbed*, 881 F.3d at 290 at 290 (citations omitted).

16

there is no way of knowing whether that amount is higher or lower than the actual cost of Plaintiff's lodging.

Making matters worse, Defendant cannot petition the Department of Labor to provide a fair value or reasonable cost assessment of Defendant's housing on the eve of trial – in addition to the fact that Defendant failed to keep any contemporaneous records to provide an actual cost assessment. *See* 29 C.F.R. § 516.27(a) ("[A]n employer who makes deductions from wages of employees for 'board, lodging, or other facilities' . . . shall maintain and preserve records.").[11] Because there is no evidence that Defendant possesses the necessary records to provide an actual cost analysis and the time to remedy an expert report would otherwise be untimely, Plaintiff's motion to strike Ms. Vernon is **GRANTED** under the helpfulness prong of Rule 702.

## IV. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Plaintiff's *Daubert* motion against Defendant's expert witness, Ms. Vernon**,** is **GRANTED**. [D.E. 43]. Ms. Vernon's expert report is stricken in its entirety.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 24th day of September, 2018.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge

---

[11] The Department of Labor regulations require an employer claiming the § 203(m) wage credit for lodging to keep two kinds of records: (1) records regarding the cost to the employer of providing the housing and (2) records regarding wage calculations taking lodging into account. *See* 29 C.F.R. §§ 516.27(a)(1),(b).